Keith and Margaret SIMPSON, Individually and as Next Friends of Jennifer Simpson, Relators,

v.

The Honorable Geraldine TENNANT, Judge of the 113th District Court of Harris County, Texas, Respondent.

No. B14–93–01100–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 24, 1994.

Randy Schaffer, Jane C. Disko, Houston, for appellant.

Barry G. Flynn, Phillip L. Sampson, Jr., D. Gibson Walton, Paul E. Stallings, Houston, W. Carroll Kelly, Dallas, for appellee.

Before SEARS, CANNON and LEE, JJ.

## OPINION

CANNON, Justice.

### I. NATURE OF THE CASE

This is an original mandamus proceeding. Keith and Margaret Simpson (the "Simpsons") sued the Texas Annual Conference of the United Methodist Church (the "Conference") for negligence and gross negligence in connection with severe injuries sustained by their daughter, Jennifer, in a playground accident at the First United Methodist Church of Pearland (the "Church"). During discovery, the Simpsons deposed Reverend Clifton Lamb, pastor of the Church. Reverend Lamb indicated that he had obtained some information concerning the accident from an unidentified person. However, claiming the communications-to-clergymen privilege, Reverend Lamb refused to divulge that information or the identity of the source. The trial court, Judge Tennant, denied the Simpsons' motion to compel Reverend Lamb to identify the source. The Simpsons now ask us to issue a writ of mandamus ordering the trial court to compel Reverend Lamb to answer. We deny the writ.

### II. FACTS

On May 21, 1992, officials of the Church caused the legs of a monkey-bar set to be cut and the set to be laid on its side in the church playground. The monkey bars were not chained to a fence to prevent their use; nor were Church personnel warned not to use them until the set could be anchored safely in the ground. Unknown persons stood up the monkey bars between Saturday night, May 23, and Sunday morning, May 24. On Sunday morning, teachers and aides took a Sunday school class to the playground and allowed the children to use the monkey bars without realizing that they were unsecured. Jennifer Simpson was swinging on the monkey bars when they collapsed upon her. Jennifer, three years old at the time, suffered a broken neck and was rendered quadriplegic and respirator-dependent for life.

Keith and Margaret Simpson, relators, settled their claim against the Church. Subsequently, they filed a lawsuit against the Conference. On September 9, 1993, at a deposition, the Simpsons asked Reverend Lamb if he had any information as to who stood up the monkey bars. Reverend Lamb indicated that he had some "iffy" information but invoked the communications-to-clergymen privilege and refused to disclose what information he had or who gave it to him. The questions were certified.

The Simpsons filed a motion to compel answers to certified deposition questions. On October 29, 1993, Judge Tennant conducted a hearing and denied relief.

### III. BASIS FOR MANDAMUS

The Simpsons complain that the trial court abused her discretion by erroneously interpreting the communications-to-clergymen privilege in denying the requested discovery. The Simpsons argue that the trial court's ruling was arbitrary, unreasonable, and a clear and prejudicial error of law. The Simpsons claim the right to discover the identity of persons who are potential parties or who have information concerning the liability of others. The Simpsons maintain that the requested information goes to the heart of their lawsuit.

The Simpsons contend that the privilege protects only the divulgence of the *substance* of the confidential communications made to a clergyman, not the *identity* of the communicant. Absent disclosure of the identity of the communicant, the Simpsons are unable to determine whether the communicant claims

the privilege and, if so, whether the communicant's actions before or after the communication have effectively waived the privilege. TEX.R.CIV.EVID. 511. The Simpsons argue that they probably will not need to question the communicant regarding the actual conversation with Reverend Lamb. They assert that it should suffice simply to ask the communicant about *who* stood up the monkey bars and *when*.

## IV. STANDARD OF REVIEW

■■■■ Mandamus is an extraordinary remedy, available only in situations of manifest and urgent necessity. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992) (orig. proceeding). Mandamus issues only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy at law. *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex. 1985) (orig. proceeding). The Simpsons do not have an adequate remedy at law. The Simpsons' statute of limitations expires on May 24, 1994. If they cannot identify all parties and persons with knowledge of relevant facts before then, no appeal could ever remedy the situation. *See GAF Corp. v. Caldwell*, 839 S.W.2d 149, 152 (Tex.App.— Houston [14th Dist.] 1992, no writ) (orig. proceeding).

■■■■ A trial court abuses its discretion only when it reaches a decision "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Id.* We must determine whether the trial court acted without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). The resolution of factual issues is committed to the trial court's discretion, and we may not substitute our judgment for that of the trial court. *GAF Corp.*, 839 S.W.2d at 150. The Simpsons must establish that the trial court could reasonably have reached but one conclusion. *Id.* Our review of the trial court's determination of the legal principles controlling its ruling, however, is far less deferential. *Id.* A trial court has no discretion in determining what the law is or in applying the law to the facts. *Id.* A failure by the trial court to properly analyze or apply the law constitutes an abuse of discretion. *Id.*

## V. ANALYSIS

The issue before us is one of first impression in Texas: Whether the communications-to-clergymen privilege provided by Texas civil evidence Rule 505 protects the *identity* of the communicant. We squarely confront the tension between discovery and privilege. The purpose of discovery is to facilitate the search for truth, to enable courts to decide cases "by what the facts reveal," not "by what facts are concealed;" the purpose of privilege is to suppress information, even if relevant and vital. Helen A. Cassidy & Edward L. Rice, *Privileges and Discovery: Part One—The Expanding Scope of Discovery*, 52 Tex.B.J. 462, 462 (1989) (citation omitted). In this case, we resolve the tension in favor of privilege and conclude that the identity of Reverend Lamb's communicant is protected.

### A. The Rule

**Rule 505. Communications to Clergymen**

(a) **Definitions.** As used in this rule:

(1) A "clergyman" is a minister, priest, rabbi, accredited Christian Science Practitioner, or other similar functionary of a religious organization or an individual reasonably believed so to be by the person consulting him.

(2) A communication is "confidential" if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.

(b) **General rule of privilege.** A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman in his professional character as spiritual advisor.

(c) **Who may claim the privilege.** The privilege may be claimed by the person, by his guardian or conservator, or by his personal representative if he is deceased. *The person who was the clergyman at the*

*time of the communication is presumed to have authority to claim the privilege but only on behalf of the communicant.*

TEX.R.CIV.EVID. 505 (emphasis added).

## B. The Certified Questions

The only evidence presented at the trial court's hearing on the Simpsons' motion to compel was an excerpt from Reverend Lamb's deposition containing the certified questions and his replies:

Q: [The Simpsons' Counsel] Do you have any idea who stood the monkey bars up?

A: [Reverend Lamb] I did not see them at all. I mean I didn't even know they were cut until after the accident and—

Q: All right. Do you have any information that you have obtained since the incident as to who stood them up?

A: Well, I have some iffy—some iffy information.

Q: Tell me what you got?

[The Conference's Counsel]: I think we need to recognize there is a clergyman privilege that on behalf of the Conference I want to exercise. It's Rule 505 of the Texas Rules of Evidence.

So, if he's been told anything in his capacity as a clergyman, on behalf of the Conference, I wish to invoke that privilege.

Q: Are you saying there was a true confession? Or somebody just gave you some information?

A: True confession. Private and—would be considered that. And I would—I would prefer not to divulge it.

Q: Well, without telling me who gave you the information, what do you—what's your understanding as to how they got set up?

[The Conference's Counsel]: Once again, I invoke the privilege.

[Reverend Lamb]: Once again, I'd prefer not to deal with that at all.

[The Simpsons' Counsel]: Have you got a copy of the Rules?

[The Conference's Counsel]: Sure do.

[The Simpsons' Counsel]: Let me look at it.

(Brief Recess)

Q: Reverend Lamb, Rule 505—

[The Conference's Counsel]: Texas Rules of Evidence.

Q: Texas Rules of Evidence, Rule 505(b) says that, "A clergyman has a privilege to disclose—" I'm sorry "—to refuse to disclose a confidential communication by a person to a clergyman—" in your professional character as spiritual advisor?

A: Yes, sir.

Q: Do you—Do you want to invoke that privilege as to the substance of what was told to you by this person?

A: Yes. I do.

Q: All right. Tell me the name of the person.

A: No, sir.

Q: Well, with all due respect, the privilege is to—not to reveal the communication; but there is nothing in here that says you cannot disclose the person.

Are you refusing to do that?

A: Yes, sir.

Q: All right.

[The Simpsons' Counsel]: Let's certify that question.

Q: Have you asked that person whether that person will agree to testify concerning this matter?

A: No, sir.

Q: Have you asked that person whether that person will agree to allow you to testify to what the person—

A: No, sir.

Q: —told you?

A: No, sir.

Q: So, you're claiming this privilege without knowing whether the person, himself or herself, would claim the privilege?

A: When it was told to me, it was told in the confidence of the confessional—informal confessional that we Methodists use—

Q: Okay.

A: —and asked that our conversation be kept confidential. And it came to me as a burden and a pain; and I prefer that—that I not answer any questions—

Q: Okay.

A:  —concerning it.

Q:  Do you know whether other persons were involved in the standing up of the monkey bars beyond the person who told you?

A:  I do not know.

Q:  All right.  And when was this that the conversation occurred between you and this person?

A:  In the Fall.  I—I'm not sure of the date.  October, November, I would think.

Q:  Of 1992?

A:  Of '92.

Q:  Had you been making some inquiry as to—

A:  No, sir.

Q:  —the circumstances?

A:  No, sir.

Q:  So, somebody just came to you and told you?

A:  Yes, sir.

Q:  When did you send your memo to the Conference regarding the Simpson incident?  The document that's been referred to as Lamb Exhibit 3?

A:  May I see it?

[The Simpsons' Counsel]: (Indicating)

[The Conference's Counsel]: (Indicating)

[Reverend Lamb]: (Complying)

A:  Oh.  This one?  I believe that it's—it's dated in December of 1992.

Q:  Okay.  And your conversation with the confessor, I'll call him was in the Fall of 1992?

A:  Yeah.  In—In the same—In the same time frame.  Yes.

Q:  Okay.  So, the—memo was prepared after the person had—had confessed to you, so to speak?

A:  I'm not real sure about the time frame.

Q:  Okay.  In your memo, you say—and I quote from page two—"None of us know who set the monkey bars back up on Saturday night or Sunday morning."

Well—

A:  Well, the obviously it must have been afterwards.

Q:  Or obviously you weren't telling the Conference what you knew?  Right?

A:  One, or the other.  But I would say that if I had known, I would not put that paragraph in there at that time.

Q:  Okay.  So, even though you know there is somebody out there who might be answerable to Jennifer Simpson and her family for this incident, you decline to provide that information with—even without asking the person if it's acceptable to do so?

A:  It was given to me in confidence— with that understanding that it would be in confidence.  And that's the way it does remain.  That's correct.

\*    \*    \*    \*    \*    \*

### C.  Rule 505 Protects the Communication's Content

■ At the outset, we hold that the trial court did not abuse its discretion in finding that the basic content of the communication between Reverend Lamb and the unidentified communicant was privileged.

In his deposition, Reverend Lamb testified as follows:

Q:  [The Simpsons' Counsel]:  Are you saying there was a true confession?  Or somebody just gave you some information?

A:  [Reverend Lamb]:  *True confession. Private and—would be considered that. . . .*

\*    \*    \*    \*    \*    \*

Q:  So, you're claiming this privilege without knowing whether the person, himself or herself, would claim the privilege?

A:  When it was told to me, *it was told in the confidence of the confessional —informal confessional that we Methodists use—*

Q:  Okay.

A:  —and *asked that our conversation be kept confidential.  And it came to me as a burden and a pain. . . .*

\*    \*    \*    \*    \*    \*

Q:  Okay.  So, even though you know there is somebody out there who might be answerable to Jennifer Simpson and her family for this incident, you decline to pro-

vide that information with—even without asking the person if it's acceptable to do so?

A: *It was given to me in confidence — with that understanding that it would be in confidence....*

(Emphasis added.)

Reverend Lamb's testimony is evidence from which the trial court could have concluded that the communication to Reverend Lamb was a "confidential communication by [a] person to a clergyman in his professional character as spiritual advisor." *See* RULE 505(b). The trial court could also have concluded that Reverend Lamb had authority to claim the privilege on behalf of the communicant. *See* RULE 505(c).

The Simpsons propose that the unidentified communicant had a purely secular concern in contacting Reverend Lamb, i.e., a desire not to become involved in the litigation as a party or a witness. But Reverend Lamb's testimony that the communication came to him in the "informal confessional" as a "burden and a pain" was evidence from which the trial court could have found that the communicant was seeking spiritual solace and guidance.

### D. Rule 505 Protects the Communicant's Identity

The real issue in this case is whether the scope of the communications-to-clergymen privilege encompasses the *identity* of the communicant. We hold, on the facts of this case, that it does.

*1. Wigmore's Four Principles of Privilege*

Dean Wigmore sets out four criteria for determining when a communications privilege is justified: (1) The communications must originate in a *confidence* that they will not be disclosed; (2) This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties; (3) The relation must be one which in the opinion of the community ought to be sedulously *fostered;* and (4) The injury that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for

the correct disposal of litigation. *Nicholson v. Wittig,* 832 S.W.2d 681, 688 (Tex.App.— Houston [1st Dist.] 1992, no writ) (orig. proceeding), quoting 8 JOHN HENRY WIGMORE, EVIDENCE § 2285 (McNaughton rev. 1961) (footnote omitted) (emphasis in original).

■ By issuing Rule 505, the Texas Supreme Court has obviated the need to apply the Wigmore criteria in a case-by-case rejustification of the communications-to-clergymen privilege. However, the Wigmore criteria are still useful when the *scope* of the privilege is at issue, as in the present case. *See* Kathleen L. Cerveny & Marian J. Kent, *Evidence Law—The Psychotherapist–Patient Privilege in Federal Courts,* 59 Notre Dame L.Rev. 791, 812, 815 n. 96 (1984); *and* Ellen S. Soffin, *The Case for a Federal Psychotherapist–Patient Privilege that Protects Patient Identity,* 1985 Duke L.J. 1217, 1233, 1244 (1985). We therefore use the Wigmore criteria as a framework for analysis.

(a) Did the communicant's revealing his identity to Reverend Lamb originate in a confidence that it would not be disclosed?

We hold that the trial court could have found from Reverend Lamb's testimony that the unidentified communicant understood that his identity would not be revealed. Indeed, people take for granted that they have the complete right to talk to their ministers penitentially in confidence. Seward Reese, *Confidential Communications to the Clergy,* 24 Ohio St.L.J. 55, 81 (1963). "[P]eople have the right to go to an ordained clergyman and tell their troubles without fear. This is the refuge of people in trouble, acknowledged by all men of goodwill." *Id.* (footnote omitted). "The secrecy of the confessional is absolute. It has nothing to do with the law of the realm. Nothing in the world can change it, not even an act of parliament." *Id.* at 56 n. 7.

(b) Was this element of confidentiality essential to the full and satisfactory maintenance of the relationship between Reverend Lamb and the communicant?

Persons facing crises decisions should not be required to be guarded in their disclo-

sures to a spiritual advisor. *Wittig*, 832 S.W.2d at 687. As is true in regard to the relationship between psychotherapist and patient, it is essential that the person seeking moral and spiritual guidance feels assured from the outset that whatever he may say will be forever kept confidential. *See* 1985 Duke L.J. at 1224. Communications may reveal unattractive and antisocial tendencies. *See id.* at 1225. Communicants must be able to communicate their thoughts and emotions freely and fully, even when such thoughts are abhorrent to society. *See id.* Without a promise of secrecy, buttressed by a legal privilege, a communicant would not be prone to reveal personal data which he fears might evoke social disapproval. *Id.* at 1224 n. 36. Communicants would forego needed intimate communication with the clergy. *See id.* at 1225. Many persons will go to their own minister for guidance and counseling when they would not go to a psychologist or counselor. Sandra M. Little, *Counsel by Clergy: Is it Privileged?*, 10–SUM Fam.Advoc. 24, 24 (1987).

We believe that confidentiality with respect to a communicant's identity is critical to the special relationship between communicant and clergyman. What communicant would be completely candid with his minister knowing that his identity could be revealed and he could be subjected to independent interrogation on matters related to his communications with the clergyman?

### (c) Was this relationship one that, in the opinion of the community, ought to be sedulously fostered?

"The priest-penitent privilege recognizes the *human need* to disclose to a spiritual counselor, in *total and absolute confidence*, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." *Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980) (emphasis added). The principle on which Rule 505 rests is one of public policy. *See* Recent Case, *Witnesses— Privileged Communications to Clergyman*, 10 Tex.L.Rev. 251, 252 (1932).

We are told of one in an ancient time who 'found no place of repentance, tho he

sought it carefully and with tears.' This statute is based in part on the idea that the human being does sometimes have need of a place of penitence and confession and spiritual discipline. When any person enters that secret chamber, this statute closes the door upon him, and civil authority turns away its ear.

*Id.*, quoting *Reutkemeier v. Nolte*, 179 Iowa 342, 161 N.W. 290 (1917).

"The confession, or confidential communication, is too important to the people to permit the security of the penitent to be shattered, particularly when he may not be well equipped to distinguish between sin and crime, or what may or may not later be of probative value in a possible future law suit." 24 Ohio St.L.J. at 82. Today, the need for a broad communications-to-clergymen statute is made more manifest as a result of the development within this century of a greater psychological understanding and analysis of the working of the human mind. *Id.* "[T]he emotional, mental, and spiritual health of many of our citizens depends upon the free and confidential access to their clergymen or spiritual advisors...." MISS.CODE.ANN. § 13–1–22 cmt. (Supp.1993)

We believe that the relationship between communicant and clergyman is highly valued by society and is a relationship to be fostered with careful perseverance.

### (d) Would the injury that would inure to the communicant-clergyman relationship by the disclosure of the communicant's identity be greater than the benefit gained in the correct disposal of litigation?

Testimonial exclusionary rules and privileges contravene the fundamental principle that "the public ... has a right to every man's evidence." [Citation omitted]. As such, they must be strictly construed and accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." [Citation omitted].

*Trammel*, 445 U.S. at 50, 100 S.Ct. at 912.

Here, we must decide whether a privilege against disclosure of a communicant's identi-

ty sufficiently promotes important interests to outweigh the need for probative evidence in the administration of civil litigation. *See id.*

Justice Stewart's concurrence in *Trammel* sets out criteria for deciding when a privilege should be subjected to the most careful scrutiny: (1) the privilege is the product of a conceptualism long ago discarded, (2) the privilege is universally criticized by scholars, and (3) the privilege has long been abandoned in many jurisdictions. *Id.* at 54 n. 1, 100 S.Ct. at 914 n. 1 (Stewart, J., concurring), citing *Hawkins v. United States,* 358 U.S. 74, 81–82, 79 S.Ct. 136, 140, 3 L.Ed.2d 125 (1958). Cautioning against "indulg[ing] in mere assumptions, perhaps naive assumptions, as to the importance of [an] ancient rule," Justice Stewart concurred with the majority in discrediting a criminal defendant's privilege against adverse spousal testimony. *Id.*

The communications-to-clergymen privilege meets none of Justice Stewart's criteria for rendering the privilege suspect and triggering an exceptionally narrow construction or presumption of invalidity. In fact, rather than being "abandoned in many jurisdictions," all but three states have enacted some type of communications-to-clergymen privilege. Steven Goode, M. Michael Sharlot, & Cathleen C. Herasimchuk, *Article V: Privileges,* 30 Hous.L.Rev. 489, 567 n. 343 (1993). Indeed, states have deemed it necessary to take positive action and enact clergyman privilege statutes since no such privilege existed at common law. Roy R. Ray, *The Law of Privilege in Texas,* 12 Tex.L.Rev. 143, 156 (1933).

Communicant-clergyman confidentiality benefits the individual communicant, the clergy, and society. The individual benefits from unfettered freedom of religion in his use of the confessional; his perceived ability to communicate with God through an emissary; the therapeutic value in obtaining psychological and physical relief from fear, tension, and anxiety; and in his exercise of a fundamental right to privacy. 24 Ohio St.L.J. at 60. The clergy benefits in being able to safely draw out a communicant's innermost thoughts and feelings with the assurance that confidences

are protected by public policy. *Id.* The church as an institution benefits in enjoying recognition of its prestigious place in society. *Id.* The judiciary benefits by avoiding direct confrontations with the clergy. *Id.* There is the realization that requiring the clergy to testify will not necessarily produce testimony. "The concept of jailing a clergyman for adhering to the absolute duty imposed upon him by deep religious beliefs is offensive." Brian Domb, *I Shot the Sheriff, but Only My Analyst Knows: Shrinking the Psychotherapist–Patient Privilege,* 5 J.L. & Health 209, 216 (1990–91).

The Simpsons argue that, under TEX. R.CIV.P. 166b, subd. 2 they are entitled to discover the identity of persons who are potential parties or have information concerning the liability of others. But, the broad scope of discovery is limited by the legitimate interest of the opposing party to avoid the disclosure of privileged information. *Jampole v. Touchy,* 673 S.W.2d 569, 573 (Tex. 1984) (orig. proceeding). It is true that discovery proceedings have as their aim and purpose the administration of justice by allowing the parties to obtain the fullest knowledge of issues and facts prior to trial; however, if matter sought to be discovered is privileged, it is not subject to discovery. *West v. Solito,* 563 S.W.2d 240, 243 (Tex.1978) (orig. proceeding). Rule 166b, subd. 3e exempts from discovery "any matter protected from disclosure by ... privilege." *Giffin v. Smith,* 688 S.W.2d 112, 114 (Tex.1985) (orig. proceeding); TEX.R.CIV.P. 166b, SUBD. 3e. This exemption is qualified: "Nothing in this paragraph 3 shall be construed to render non-discoverable the identity and location of any potential party [or] any person having knowledge of relevant facts...." RULE 166b, SUBD. 3e. But we interpret this qualification as permitting the disclosure of the identity of potential parties or witnesses whose identities were learned independently of any privileged communication. We do not read the qualification to authorize the disclosure of the identity of a communicant when the identity was only learned through a confidential communication opportunity.

The Simpsons are no worse off for being denied the identity of the communicant since

that information would not have existed but for the privilege. Stephen A. Saltzburg, *Communications Falling Within the Attorney–Client Privilege,* 66 Iowa L.Rev. 811, 817 (1981). "[C]ommunications that are made because of the privilege and which the law assumes never could have been made without the privilege remain private. Nothing is hidden that the rest of the world would have reasonably expected to be available." *Id.* at 818 (footnote omitted).

In sum, "[t]he benefit of preserving [the communications-to-clergymen privilege] overbalances the possible benefit of permitting litigation to prosper at the expense of the ... spiritual rehabilitation of a penitent. The rules of evidence have always been concerned not only with truth but with the manner of its ascertainment." *Mullen v. United States,* 263 F.2d 275, 280 (D.C.Cir.1958). "I think a communication made in reasonable confidence that it will not be disclosed, and in such circumstances that disclosure is shocking to the moral sense of the community, should not be disclosed in a judicial proceeding...." *Id.* at 291 (Edgerton, J., concurring).

We believe that the Wigmore analysis supports the conclusion that the identity of a person who has made a privileged communication to a clergyman is privileged itself.

### 2. Analogy to Attorney–Client Privilege

The Simpsons analogize the relationship between a clergyman and his communicant with that between an attorney and his client. The Simpsons correctly contend that the identity of an attorney's client is generally not privileged. *In re Grand Jury Subpoena for Attorney Representing Criminal Defendant Reyes–Requena,* 926 F.2d 1423, 1431 (5th Cir.1991). The Simpsons do recognize an exception to this general rule, where so much of the communication between the attorney and client has already been disclosed, that revealing the identity of the client would, in effect, disclose more of the communication including the confidential motive for the client's seeking legal advice. *Id.* The Simpsons maintain, however, that this exception does not apply in the present case.

First, we are unconvinced that a communicant confiding in a clergyman is analogous to a client seeking legal assistance. A legal client does not usually hold the same expectation of confidentiality with respect to his identity. He typically approaches an attorney in anticipation of judicial proceedings where it is highly likely that his identity will be discoverable at some point in the litigation process. 66 Iowa L.Rev. at 821. Attorneys typically do not take steps to prevent a client from being seen entering their offices, to avoid using the client's name in addressing correspondence, or to feign from greeting clients by name in the presence of others. *Id.* Therefore, an attorney's client does not normally harbor a realistic expectation that his identity will be protected indefinitely.

In bold contrast, a communicant seeking to unburden himself of a psychological burden and pain and hoping to achieve spiritual solace brings to the "confessional" different expectations. The communicant "bares his soul" to the clergyman and reveals his innermost thoughts and feelings. The communication experience is sought for its own sake to achieve peace of mind and not with the anticipation that the information will be used by the clergyman to represent the communicant in a public forum.

We therefore find suspect the premise that communications to a clergyman are on the same plane as those to an attorney.

Second, even if we pursue this analogy, we would find that the identity of Reverend Lamb's communicant is so inextricably intertwined with the subject matter of the communication as to warrant its protection by the privilege. *See In re Reyes–Requena,* 926 F.2d at 1432. From Reverend Lamb's testimony, the trial court could have found that: (1) the unidentified communicant gave Reverend Lamb information relating to who stood up the monkey bars; (2) the communicant came to Reverend Lamb to make a "true confession," i.e., to seek relief for a "burden and a pain." From these findings, the trial court could have inferred that the communicant was implicated, directly or indirectly, in the events leading up to the playground accident. Revealing the communicant's identity would supply a missing com-

ponent of the communication to Reverend Lamb, i.e., the name of the individual implicated in the setting up of the monkey bars. In such circumstances, we protect the communicant's identity because connected inextricably with a privileged communication. *See id.*

The identity of a communicant may not be privileged merely because it's revelation incriminates the communicant in wrongdoing, but neither does his identity lose its privilege merely because the information would be useful to litigants. *See id.* The communications-to-clergyman privilege prevents the Simpsons from obtaining useful information, but this is the price we pay for a system that affords individuals at least one harbor of refuge where they can make a full disclosure of their most personal and sensitive feelings in return for understanding and spiritual guidance. *See id.* RULE 505 does not refer only to the *content* of communication, but rather, focuses on the counseling *opportunity*. *Wittig,* 832 S.W.2d at 686.

At the hearing on the motion to compel, The Simpsons' counsel stated: "If the identity of the communicant is disclosed, we will probably never need to get into the substance of what he told the pastor, because all I would intend to do would be to ask that person *what he did, what he saw or what he heard.* And what he told the pastor would never become an issue." (Emphasis added.) We fail to see how a communicant, truthfully answering these questions, would not be forced to reveal the substance of his communications to Reverend Lamb. The communicant could not claim a privilege as to the facts underlying his communication to Reverend Lamb, the Simpsons would have gained access to information they would not have had but for the communications-to-clergyman privilege, and the privilege would be effectively negated. *See In re Reyes–Requena,* 926 F.2d at 1432 (the government is not credible when it asserts that it sought only the fact of intervenor's identity rather than confidential communications; the government clearly sought the identity in hopes of broadening their investigations by obtaining more defendants to charge in a conspiracy). Of course, if the Simpsons locate the communicant by independent means, then they could treat him as any other witness as to facts within his knowledge with the exception of actual privileged statements made to Reverend Lamb. 66 Iowa L.Rev. at 823.

### 3. The Texas Communications-to–Clergymen Privilege is Broad in Scope

Our decision to uphold the trial court's protection of the identity of Reverend Lamb's communicant is consistent with what we believe to be the intent of the Texas legislature and Supreme Court to provide Texans with a strong communications-to-clergymen privilege. First, the Texas privilege is broader than in some jurisdictions in that a communication need not be strictly "penitential" to qualify for protection. *Easley v. State,* 837 S.W.2d 854, 856 (Tex.App.—Austin 1992, no pet.) (interpreting the identical Rule 505 in the code of criminal evidence). Second, while other comparable Texas communications privilege rules contain express exceptions, the communications-to-clergyman privilege contains none at all. *Wittig,* 832 S.W.2d at 686; *see* RULES 503 (lawyer-client), 504 (husband-wife), 508 (informer), 509 (physician-patient), & 510 (mental health info). Third, and most significantly, when Rule 505 was adopted in 1983, it dropped a provision of the previous communications-to-clergymen statute that had given the trial court discretion to compel disclosure of a communications to a clergyman if necessary to a proper administration of justice. *Wittig,* 832 S.W.2d at 684–85; TEX.REV.CIV.STAT.ANN. art. 3715a (Act of June 12, 1967, 60th Leg. R.S., ch. 435, § 1, 1967 Tex.Gen.Laws 1005, *repealed by* order of the Texas Supreme Court, dated Nov. 23, 1982, effective Sept. 1, 1983, adopting the Texas Rules of Evidence.)

We perceive a clear intent to afford Texans the opportunity for spiritual counseling in "total and absolute confidence." *See Trammel,* 445 U.S. at 51, 100 S.Ct. at 913.

The Simpsons argue that a person's identity is not a "communication" at all, but a mere "observation" and discoverable. The Simpsons cite cases where a communicant's demeanor and state of mind were discoverable. *Snyder v. Poplett,* 98 Ill.App.3d 359, 53

Ill.Dec. 761, 764, 424 N.E.2d 396, 399 (1981); *Buuck v. Kruckeberg,* 121 Ind.App. 262, 95 N.E.2d 304, 307 (1950); *State v. Kurtz,* 564 S.W.2d 856, 861 (Mo.1978). But in all these cases, the communicant's identity was already known. These cases are no authority for the proposition that the hitherto unknown identity of a communicant is discoverable as a mere "observation."

### 4. Legal Precedent

There is virtually no caselaw, in Texas or elsewhere, dealing with the issue of whether the identity of a person, making a privileged communication to a clergyman, may be severed from the communication and disclosed. However, our decision is consistent with the one Texas case that has interpreted RULE 505.

In *Nicholson v. Wittig,* a wife sued a hospital for the wrongful death of her husband. *Wittig,* 832 S.W.2d at 682. The wife alleged that the hospital had injuriously delayed treatment. At the hospital, the wife had spoken with a minister who was also a hospital employee. The minister indicated that the wife had given him information relevant to the reason for the delay in treatment. The hospital tried to discover the conversations between the wife and minister, but the wife claimed the communications-to-clergymen privilege. The trial court upheld the privilege and denied discovery of the conversations. The hospital sought a writ of mandamus to compel discovery.

The court of appeals denied the writ. The wife was making *offensive* use of the privilege, i.e., seeking affirmative relief and preventing the disclosure of information potentially damaging to her claim. Also, the communication between the woman and the minister had both secular and non-secular components. Nevertheless, the court held that allowing conversations to be dissected and partitioned into categories would eviscerate Rule 505. *See id.* at 687. Persons facing crises decisions should not be required to be guarded in their disclosures to a spiritual advisor. *Id.* Justice O'Conner dissented in *Wittig,* in part on the basis that a party may not "use one hand to seek affirmative relief and with the other hand lower an iron cur-

tain of silence" around the facts of the case. *Id.* at 691 (O'Conner, J., dissenting), quoting *Ginsberg v. Fifth Court of Appeals,* 686 S.W.2d 105, 108 (Tex.1985) (orig. proceeding). In the present case, neither Reverend Lamb nor the Conference seeks affirmative relief.

While not dealing with the issue of a communicant's identity, *Wittig* strongly affirms the vitality of the communications-to-clergymen privilege and signals a reluctance, which we share, to set in motion its piecemeal erosion.

Looking to other jurisdictions, the only reported case with facts at all similar to the present case is *Lewis v. New York City Housing Auth.,* 151 A.D.2d 237, 542 N.Y.S.2d 165 (N.Y.App.Div.1989), *appeal denied,* 75 N.Y.2d 705, 552 N.Y.S.2d 927, 552 N.E.2d 175 (1990). In *Lewis,* a minister who was also a police officer was approached after a church service by an elderly man. The man gave the minister a packaged gun. The minister passed the weapon to a fellow police officer to take it to the police station. The minister refused to comply with police procedures requiring him, *inter alia,* to identify the person who had given him the gun. Six days later, the minister did escort the man who had given him the gun to the police station for questioning. However, the minister/police officer was disciplined for violation of police procedures. He appealed, claiming that the man had approached him in his professional capacity as a minister and that the man's identity was confidential. The appeals court held that the identity of the man was privileged and reversed the disciplinary action.

The Simpsons contend that *Lewis* is distinguishable from the present case because the minister/police officer had brought the man in for questioning by the time of the appeal. Therefore, there was no longer any need for the man's identity as for the communicant's identity in the present case. But the basis of the complaint against Lewis was the delay in reporting the man's identity. The court held, in essence, that the delay was justifiable because the minister could not be compelled to reveal the name of the man with the gun. There was no discussion in the opinion to suggest that the court placed any reliance

on the fact that the minister/police officer later brought the man to the police station.

In any event, if *Lewis* is imperfect authority, we can find *no case at all* where a court held that a clergyman was compelled to reveal the identity of a communicant. Indeed, the only *unreported* case with facts at all similar also holds that the identity of a communicant is privileged. In *People v. Daniel Phillips & Wife* (1813, New York Court of General Sessions, abstracted and reprinted in 1 Western L.J. 109), a priest received stolen property, returned it to its rightful owner, but refused to testify as to the identity of the thief. The government's attempt to prosecute the thief for grand larceny was thwarted as the court upheld the clergyman privilege. *See* Annotation, *Matter to Which the Privilege Covering Communications to Clergyman or Spiritual Advisor Extends,* 71 A.L.R.3d 794, 813 (1976).

In sum, what little precedent exists supports the conclusion that the identity of a communicant of a privileged communication to a clergyman is protected.

## VI.  CONCLUSION

We conclude that the trial court did not abuse its discretion in finding that the identity of Reverend Lamb's communicant was protected by the communications-to-clergymen privilege. The trial court could have based its decision on fundamental principles of privilege or on the basis that the communicant's identity was inextricably intertwined with the content of the communication. Her decision was consistent with the concept of a strong Texas communications-to-clergymen privilege and available, albeit sparce, precedent. The trial court did not err in denying the Simpsons' motion to compel, and we deny the writ.