

# NUMBER 13-19-00110-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**BLAINE CREWS AND HANNAH CREWS,**                    **Appellants,**

**v.**

**RICHARD GALVAN AND SONIA GALVAN,**                    **Appellees.**

### On appeal from the 445th District Court
### of Cameron County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Perkes**
**Memorandum Opinion by Chief Justice Contreras**

In this interlocutory appeal, appellants Blaine Crews and Hannah Crews (the Crewses) appeal the trial court's denial of their motion to dismiss a defamation per se claim brought by appellees Richard Galvan and Sonia Galvan (the Galvans). By four issues, which we treat as two, the Crewses argue that: (1) the trial court erred when it

denied their motion to dismiss, and (2) they are entitled to attorney's fees. We reverse the trial court's denial of the Crewses' motion to dismiss and remand for the trial court to enter an order dismissing the Galvans' defamation per se claim and for further proceedings consistent with this memorandum opinion.

## I. BACKGROUND[1]

According to the Crewses, when Hannah was seventeen years old, she attended the Northway Bible Church in Harlingen, Texas, where Richard was a youth minister and pastor. Hannah had been active in the church's youth group and had known Richard and his wife Sonia since she was twelve years old. During the summer between her junior and senior year of high school, Hannah and her high school boyfriend broke up. Hannah was heartbroken, and Richard offered her a job at his business and to counsel her through her emotional grief. While Hannah was working at his business, Richard would call her into his office "almost daily" to discuss her feelings and to pray over her. During these conversations, Richard repeatedly brought up the extent of Hannah's physical relationship with her ex-boyfriend. Richard told Hannah that the reason she was heartbroken was because of the physical attachment she had developed with her ex-boyfriend and "that the physical aspect of it caused [her] to be spiritually connected to [her] ex-boyfriend's soul." Richard explained to Hannah that the way to heal from her break up was through intimacy. According to Hannah:

> [Richard] would then bait me with his questions, asking, 'so what do you think you need to do to move on from this pain?' Richard made me think I needed to respond with 'having sex,' since he had just explained that sex brought healing. He then shook his head yes and told me that he would 'help me out with this.' Richard again told me that completing this physical act of sex would heal me spiritually, since the two (physical intimacy and spirituality) were tied together. He also convinced me that since I trusted

[1] The following is taken from the parties' pleadings and affidavits.

2

him as my mentor, it was safest to go about it this way (having sex with him instead of someone else).

Nothing happened that day physically between us. It still took many more conversations to convince me that having sex with him (Richard) would help me heal. I even asked him during a later conversation, "But that means you would be taking my virginity," of which he got angry with me, stepped close to my face, and said sternly, "No, I am not taking your virginity, you are giving it to me, because you are entrusting me to help you heal." Since I had deep love and admiration for his wife Sonia, I would also ask him how it was okay to do this since he was married. He convinced me, over and over, that this act was a strictly physical action for a spiritual healing for me and me alone. But he also told me that she would never know about this, so I didn't have to worry about this hurting her.

. . . .

Finally, after weeks and weeks of conversation and manipulation and coercion and convincing in Mr. Galvan's office, at the beginning of volleyball season before school started in August of 2007, I agreed to meet Richard at the La Quinta hotel in Mercedes, TX. Richard was fearful of being discovered that day, and even thought a car across the street was a hired investigator that was possibly watching us. We went upstairs, I agreed to sexual acts, and lost my virginity that day. Afterwards, I had to go to school and travel with my team to play in the first volleyball tournament of the pre-season. I was still 17 years old. And that was the first and last time I agreed to do anything physical with Richard Galvan for the rest of my life.

Shortly after, Hannah's mother found out that Richard had sex with Hannah. Richard came to Hannah's house, confessed to Hannah's mother about it, and Hannah's mother told Richard to tell his wife. Hannah subsequently had a phone conversation with Sonia about it. Hannah insisted she did not want to press criminal charges because "Richard told me if I ever spoke about this with anyone, that no one would believe my story." In December 2007, shortly after Hannah's phone conversation with Sonia, Richard and Sonia quit as youth pastors and left the church completely. According to Hannah, she later learned that Richard had also been inappropriate with other girls she knew and that the other girls were also teenagers at the time of their interactions with Richard.

Years later, Hannah married Blaine, and she shared with him that she had been taken advantage of by her youth pastor but did not disclose the identity of the individual. In October 2018, Hannah told Blaine for the first time that the pastor was Richard. After learning of Richard's identity, Blaine became very upset and obtained Sonia's cell phone number and texted her.[2] Richard called him back almost immediately. Blaine was concerned that Richard may "still be associating himself with youth and placing himself in a position to take advantage of other young women under his authority." According to Blaine, during his conversation with Richard, Richard acknowledged that the events Blaine recounted about Richard's sexual relationship with Hannah were true. Blaine told Richard and Sonia that he was concerned about Richard being around young women and that people needed the information about his interactions with Hannah to determine whether Richard should be around their daughters. According to Richard, "Blaine Crews . . . expressed that since Hannah Crews' father never did anything in 2007, that Blaine Crews would do something about the alleged seduction and manipulation and would have used a bullet to do it." Blaine also informed Richard that he intended to contact Richard's church and the school of Richard's children, where Blaine believed he associated with young women. Blaine subsequently called Richard's church and the school of Richard's children and informed them of Richard's history and past conduct towards Hannah.

---

[2] According to the Galvans' petition, Blaine messaged Sonia over Facebook demanding to speak with Richard and Sonia. Sonia states in her affidavit that she received a Facebook message from Blaine asking for her phone number. Hannah states in her affidavit that Blaine called Richard and Sonia on the phone. In his affidavit, Richard states that he "called Blaine Crews in response to Blaine Crews' repeated contacts with my wife, Sonia Galvan."

The Galvans filed suit against the Crewses.  In their first amended original petition, Richard and Sonia pleaded causes of action for assault, intentional infliction of emotional distress, defamation per se, and public disclosure of private facts.  In their amended petition, the Galvans stated that "Blaine Crews text[ed] Plaintiff Sonia Galvan and claimed that Plaintiff Richard Galvan, seduced and manipulated Hannah Crews in 2007.  These allegations are false."  The Galvans further alleged that Blaine told Richard that:  "he would have put a bullet" in Richard's head "if Defendant Blaine Crews knew Defendant Hannah Crews in 2007"; the "phone call would not be the end"; Richard's children "would learn as well"; and that Richard will find out what Blaine "is going to do to him."

The Crewses filed a motion to dismiss the Galvans' defamation per se claim pursuant to the Texas Citizen Participation Act (TCPA), and the Galvans filed a response in opposition.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001 *et seq*.  Both parties submitted affidavits in support of their motions.  The Galvans submitted an affidavit by Richard that stated:  "I called Blaine Crews in response to Blaine Crews' repeated contacts with my wife, Sonia Galvan.  During the conversation, Blaine Crews claimed in 2007 that I manipulated and seduced Hannah Crews.  This is false."  The Crews objected to Richard's affidavit on the ground that it was conclusory, but the trial court overruled the objection and denied the Crewses' motion to dismiss.  This interlocutory appeal followed.  *See id.* § 51.014(12).

## II.    THE ANTI-SLAPP STATUTE

The Texas Legislature enacted the TCPA, "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time,

protect the rights of a person to file meritorious lawsuits for demonstrable injury."[3]  *Id.*

§ 27.002.  It protects citizens from retaliatory lawsuits that seek to intimidate or silence

them on matters of public concern, i.e., "Strategic Lawsuits Against Public Participation,"

commonly known as SLAPP suits, by providing a mechanism for summary disposition of

such suits.  *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015) (orig. proceeding).

The TCPA provides a two-step procedure for early dismissal of claims brought to

intimidate or to silence a defendant's exercise of First Amendment rights.  *See* TEX. CIV.

PRAC. & REM. CODE ANN. §§ 27.003, 27.005; *ExxonMobil Pipeline Co. v. Coleman*, 512

S.W.3d 895, 898 (Tex. 2017) (per curiam).  Under the first step, the movant seeking

dismissal under the TCPA has the burden to show by a preponderance of the evidence

that the nonmovant's legal action is based on, relates to, or is in response to the movant's

exercise of the right of free speech, the right to petition, or the right of association.  TEX.

CIV. PRAC. & REM. CODE ANN. § 27.005(b).  If the movant makes this showing, the burden

shifts to the nonmovant to establish by "clear and specific evidence a prima facie case"

for each essential element of the claim in question.  *Id.* § 27.005(c).

### III.    STANDARD OF REVIEW

We review a trial court's ruling on a TCPA motion to dismiss de novo.  *Tyler v.
Pridgeon*, 570 S.W.3d 392, 396 (Tex. App.—Tyler 2019, no pet.); *Lane v. Phares*, 544

S.W.3d 881, 886 (Tex. App.—Fort Worth 2018, no pet.).  Specifically, we consider de

novo whether each party has met its respective burden under the TCPA's two-step

dismissal mechanism.  *Tyler*, 570 S.W.3d at 396.  In our review, we consider the

---

[3] The TCPA was recently amended, effective September 1, 2019.  *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 1–9, 12 (codified at TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001, 27.003, 27.005–.007, 27.0075, 27.009–.010).  The amendments do not apply to this case, which was filed before the amendments' effective date.  *See id.* §§ 11–12.

pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based. TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a); *Campbell v. Clark*, 471 S.W.3d 615, 623 (Tex. App.—Dallas 2015, no pet.). We view the pleadings and the evidence in the light most favorable to the nonmovant when determining whether the TCPA applies. *Tyler*, 570 S.W.3d at 36.

### IV. DISCUSSION

### A. The First Prong—Right of Free Speech

The Crewses filed a motion to dismiss, and it was their burden initially to show that the complained of communication was an exercise of Blaine's right to free speech. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b). The TCPA defines "exercise of the right of free speech" as "a communication made in connection with a matter of public concern," *id.* § 27.001(3), and then defines both "communication" and "matter of public concern." *See id.* § 27.001(1), (7). A "communication" includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic. *Id.* § 27.001(1). A "matter of public concern" includes an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the market place. *Id.* § 27.001(7). The legislature expressed its intent that the statute be construed liberally. *Id.* § 27.011(b). Under this statutory framework, if the message "was made in connection with" an issue related to health or safety or community well-being, it would fall squarely within the statute. *See id.* § 27.001(1), (3), (7)(A)–(B).

Whether speech is a matter of public concern is a question of law. *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983); *Klentzman v. Brady*, 456 S.W.3d 239, 257 (Tex.

7

App.—Houston [1st Dist.] 2014), *aff'd*, 515 S.W.3d 878 (Tex. 2017). Matters of public concern include, among other things, the commission of a crime. *Klentzman*, 515 S.W.3d at 884 (citing *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492 (1975)); *see Coleman*, 512 S.W.3d at 900; *Campbell*, 471 S.W.3d at 624; *see also Cummins v. Bat World Sanctuary*, No. 02-12-00285-CV, 2015 WL 1641144, at *10 & n.77 (Tex. App.—Fort Worth Apr. 9, 2015, pet. denied) (mem. op.).

Here, Blaine communicated that: Richard had sex with Hannah when she was seventeen years old and prior to her senior year of high school; Richard was her youth minister and pastor; Richard sexually seduced Hannah under the pretense of spiritual healing; Richard offered Hannah help to heal spiritually and emotionally after her break up with her high school boyfriend; and Richard told Hannah she was entrusting him to help her heal by giving him her virginity. Under the Texas Penal Code, a sexual assault occurs if "the actor is a clergyman[4] who causes the other person to submit or participate by exploiting the other person's emotional dependency on the clergyman in the clergyman's professional character as spiritual adviser." TEX. PENAL CODE ANN. § 22.011(b)(10) (defining sexual assault by a clergyman); *see also, e.g., Hornbuckle v. State*, No. 02-06-00316-CR, 2008 WL 2168007, at *3–4 (Tex. App.—Fort Worth May 22, 2008, pet. ref'd) (mem. op., not designated for publication) (analyzing the sufficiency of the evidence on the issue of clergyman-induced consent when bishop came to victim's

---

[4] A clergyman is a minister, priest, rabbi, accredited Christian Science Practitioner, or other similarly functionary of a religious organization or an individual reasonably believed so to be by the person consulting him or her. *Simpson v. Tennant*, 871 S.W.2d 301, 303 (Tex. App.—Houston [14th Dist.] 1994, no writ) (citing TEX. R. EVID. 505); *Nicholson v. Wittig*, 832 S.W.2d 681, 684 (Tex. App.—Houston [1st Dist.] 1992, no writ) (same). The Galvans do not dispute that Richard was a clergyman under this definition.

house "to comfort her" and induced her into having sex). In such a scenario a person is legally unable to consent to sex. *See* TEX. PENAL CODE ANN. § 22.011(b)(10).

Hannah and Blaine's affidavits provide that Richard caused Hannah to submit to his sexual advances by exploiting her emotional dependence on him as her spiritual advisor. Thus, the statements complained of here concern alleged criminal conduct; therefore, the statements were made in connection with a matter of public concern. *See Brady*, 515 S.W.3d at 884; *Campbell*, 471 S.W.3d at 624; *Doe v. Mobile Video Tapes, Inc.*, 43 S.W.3d 40, 59 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.) ("The possible commission of a crime and the resulting consequences are events of legitimate public concern."); *see also Cummins*, 2015 WL 1641144, at *10 (noting that animal cruelty can be a matter of public concern because the penal code makes animal cruelty a criminal offense).

Furthermore, according to Hannah, since the alleged incidents between her and Richard occurred, she learned that Richard had "also been inappropriate with other girls [that Hannah knows], who were also teenagers at the time." The statements by Blaine that the Galvans complain of relate to the safety, health, and well-being of the community because Richard is around to teenage women at his church and at his children's school,[5] and the type of coercion, manipulation, and abuse of power alleged by the Crewses could be repeated as a result of his interaction with young women at both institutions. *See Backes v. Misko*, 486 S.W.3d 7, 18 (Tex. App.—Dallas 2015, pet. denied); *Campbell*, 471 S.W.3d at 623–24; *see also Cummins*, 2015 WL 1641144 at *10; *Nguyen v. Dallas*

---

[5] According to an affidavit from Melissa Barrera-Sosa, the executive assistant employed by the Galvans' church, Blaine expressed concern that Richard might pose a danger to other young women because Richard has a daughter who might bring friends home.

9

*Morning News, L.P.*, No. 02-06-00298-CV, 2008 WL 2511183, at \*5 (Tex. App.—Fort Worth June 19, 2008, no pet.) (mem. op.) ("Protection of children from abuse is of the utmost importance in Texas."). Blaine states as much in his affidavit: "Both of the institutions that I contacted are places where Richard has access to associate with young women who might also be subjected to the same type of misconduct." Clearly, sexual misconduct involving young vulnerable individuals are matters of public concern as they relate to health, safety, and community well-being, all included in the definition of "matters of public concern" under the TCPA. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7); *Hersh v. Tatum*, 526 S.W.3d 462, 468 (Tex. 2017). We conclude that a preponderance of the evidence shows that Blaine's communication was "a communication made in connection with a matter of public concern," and thus, an exercise of his right of free speech. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3), (7)(A)–(B).

The Galvans argue that, because the ten-year statute of limitations for the alleged offense had passed at the time of Blaine's statements, *see* TEX. CODE CRIM. PROC. ANN. art. 12.01(2)(E) (providing ten-year statute of limitations for sexual assault), the statements are no longer a matter of public concern. We disagree. The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. *U.S. v. Tavarez-Levario*, 788 F.3d 433, 437 (5th Cir. 2015) (quoting *Toussie v. U.S.*, 397 U.S. 112, 114–15 (1970)). Such a limitation is designed to protect individuals from having to defend themselves against criminal charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. *Id.* Thus, the purpose of the

10

statute of limitations is not conclusive on whether certain communications relate to a matter of public concern. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001(7), 27.011(b); *Tavarez-Levario*, 788 F.3d at 437. In other words, the bar to prosecution of an alleged offense due to the expiration of the statute of limitations does not by itself mean that the alleged crime is no longer a matter of public concern. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001(7), 27.011(b); *Tavarez-Levario*, 788 F.3d at 437. Furthermore, the Texas Penal Code provides that a convicted sex offender must register with the State's sex-offender registry for ten years after "the court dismisses the criminal proceedings . . . , the person is released from a penal institution, or the person discharges community supervision, whichever is later." TEX. CODE CRIM. PROC. ANN. art. 62.101(c)(2); *see also id.* art. 62.001(5)(A) (providing that a "reportable conviction or adjudication" for purposes of the sex-offender registration program includes sexual assault); TEX. PENAL CODE ANN. § 22.011(b)(10). This indicates that, contrary to the Galvans argument, a sexual assault offense is a matter of public concern beyond the ten-year period provided by the statute of limitations.

While we do not decide whether all alleged crimes are matters of public concern in perpetuity, we conclude that the alleged crime here continues to be a matter of public concern based on the factual allegations made by the Crewses.

## B.     The Second Prong—Clear and Specific Evidence

Having determined that Richard's defamation claim relates to Blaine's exercise of his right to free speech, we next consider whether the Galvans established "by clear and specific evidence a prima facie case for each essential element" of his claim. TEX. CIV.

11

PRAC. & REM. CODE ANN. § 27.005(c). To make this determination, we are to consider the pleadings and any supporting and opposing affidavits. *Id.* § 27.006(a).

While the TCPA does not define the phrases "clear and specific evidence" and "prima facie case," these terms have been defined by case law. "Clear" has been defined as "unambiguous, sure, or free from doubt," and "specific" is defined as explicit or relating to a particular named thing. *In re Lipsky*, 460 S.W.3d at 590. "Prima facie case" refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted. *Id.* It is the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true. *Id.* Accordingly, to avoid dismissal of a defamation claim under the TCPA, a plaintiff must present pleadings and evidence that establish the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff. *Campbell*, 471 S.W.3d at 624 (citing *In re Lipsky*, 460 S.W.3d at 591). "Conclusory statements are not probative and accordingly will not suffice to establish a prima facie case." *Better Bus. Bureau of Metro Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 355 (Tex. App.—Houston [1st Dist.] 2013, pet. denied); *see also In re Lipsky*, 460 S.W.3d at 592 (explaining that "bare, baseless opinions" are not "a sufficient substitute for the clear and specific evidence required to establish a prima facie case" under the TCPA).

The elements of defamation are: (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases. *In re Lipsky*, 460 S.W.3d at 593. The status of the person allegedly defamed determines the requisite degree of fault. *Id.* A private individual need only prove negligence, whereas a public figure or official must prove

12

actual malice. *Id.* Finally, the plaintiff must plead and prove damages, unless the defamatory statements are defamatory per se. *Id.* Defamation per se refers to statements that are so obviously harmful that general damages may be presumed. *Id.*

The Galvans allege that Blaine's statements are defamatory per se. We agree. *See id.* (stating that "[a]ccusing someone of a crime, of having a foul or loathsome disease, or of engaging in serious sexual misconduct are examples of defamation per se"). Therefore, to determine whether Richard's defamation action survived Blaine's TCPA motion to dismiss, we look only for clear and specific evidence as to the first and third elements.

As to the third element, whether the publication was made with the requisite degree of fault, Richard's status as a private individual determines the degree of fault to be applied in this case. *See In re Lipsky*, 460 S.W.3d at 593. Because Richard was a private individual,[6] rather than a public figure or official, Richard needed to present clear and specific evidence that Blaine was negligent. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998) (explaining that private plaintiff must prove only that the defendant "was at least negligent," whereas a public official or public figure must establish actual malice, which is a higher degree of fault than negligence); *Van Der Linden*, 535 S.W.3d at 200.

---

[6] Neither party argued at the trial court or on appeal that Richard is a public-figure plaintiff. Whether an individual is a public official, a public figure, or an involuntary public figure is a question of law. *See Neely v. Wilson*, 418 S.W.3d 52, 70 (Tex. 2013); *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). Generally, elected officials and candidates for elected office are considered public officials. *See Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 420 (Tex. 2000); *Casso v. Brand*, 776 S.W.2d 551, 554 (Tex. 1989). Public figures can be all purpose public figures, limited-purpose public figures, and involuntary public figures. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974); *see McLemore*, 978 S.W.2d at 571. Richard is not an elected official or a candidate for office, and there is nothing in the record indicating he has achieved fame or notoriety or become involved in a particular public controversy making him any other public figure type. *See Neely*, 418 S.W.3d at 70; *WFAA-TV, Inc.*, 978 S.W.2d at 571. Therefore, we conclude that Richard is a private figure for the purpose of this litigation.

13

Negligence in a defamation action requires the plaintiff to show (1) the defendant knew or should have known the defamatory statement was false and (2) the content of the publication would warn a reasonably prudent person of its defamatory potential. *See Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d at 809, 819–20 (Tex. 1976); *Scripps Tex. Newspapers, L.P. v. Belalcazar*, 99 S.W.3d 829, 837 (Tex. App.—Corpus Christi–Edinburg 2004, pet. denied); *see D Magazine Partners*, 529 S.W.3d at 440. Negligent conduct is determined by asking whether the defendant acted reasonably in checking the truth of the communication before publishing it. *Scripps Tex. Newspapers*, 99 S.W.3d at 837; *see, e.g.*, *D Magazine Partners*, 529 S.W.3d at 440; *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 85–86 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

Our review of the record reveals no allegations or assertions by the Galvans that Blaine was negligent. The Galvans never argued before the trial court—nor do they present any argument on appeal—that Blaine was negligent when he communicated the disputed statements. Moreover, the Galvans have never asserted that Blaine knew or should have known his statements were false. On the contrary, the pleadings and affidavits by both parties indicate the opposite—Blaine learned of the underlying facts from his wife and then contacted Richard and Sonia to ask them about those facts. According to Blaine's affidavit, Richard admitted to him that the allegations were true. Hannah's affidavit states that Richard admitted to Hannah's mom that they had sex. Nowhere in their petition or in their affidavits do the Galvans state that they informed Blaine that any of the underlying statements were false, or that Blaine knew or should have known they were false. Therefore, Blaine was not negligent. *See Newspaper*

14

*Holdings, Inc.*, 416 S.W.3d at 85–86; *cf. D Magazine Partners*, 529 S.W.3d at 440. Accordingly, the Galvans have failed to establish a prima facie case as to every element of their defamation action, and the claim must be dismissed under the TCPA. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005.

We sustain the Crewses' first issue.

## V. ATTORNEY'S FEES

By their second issue, the Crewses argue that we should remand to the trial court for an award of attorney's fees. We agree. Section 27.009 of the Texas Civil Practice and Remedies Code mandates that if an action is dismissed under the TCPA, the trial court "shall award to the moving party court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require." TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a)(1); *Sullivan v. Abraham*, 488 S.W.3d 294, 295, 299 (Tex. 2016) (stating that "the TCPA requires an award of 'reasonable attorney's fees' to the successful movant"). A "reasonable" attorney's fee "is one that is not excessive or extreme, but rather moderate or fair." *Sullivan*, 488 S.W.3d at 299. "That determination rests within the court's sound discretion, but that discretion, under the TCPA, does not also specifically include considerations of justice and equity." *Id.* Because the trial court has not yet had the opportunity to determine the amount of court costs, attorney's fees, and other expenses that should be awarded to the Crewses, we remand the case to the trial court to make that determination.

We sustain the Crewses' second issue.

15

## VI.  MOTIONS FOR SANCTIONS

During the pendency of this appeal, both parties filed motions for sanctions, and the Crewses filed a motion asking us to reconsider our denial of oral argument and to issue findings of fact and conclusions of law regarding our denial of oral argument.  In addition, the Galvans filed a motion for damages and a motion for leave to file consolidated responses to the Crewses' motions.  We grant the Galvans' motion for leave. We deny the motions for sanctions filed by both parties, the Galvans' motion for damages, and the motions filed by the Crewses.

## VII.  CONCLUSION

We reverse the trial court's denial of the Crewses' motion to dismiss and remand the case for the trial court to enter an order dismissing the Galvans' defamation per se claim and for further proceedings consistent with this memorandum opinion.


DORI CONTRERAS
Chief Justice

Delivered and filed the 10th
day of October, 2019.