# TRAMMEL *v.* UNITED STATES

No. 78–5705.   Argued October 29, 30, 1979—Decided February 27, 1980

Burger, C. J., delivered the opinion of the Court, in which Brennan, White, Marshall, Blackmun, Powell, Rehnquist, and Stevens, JJ., joined. Stewart, J., filed an opinion concurring in the judgment, *post*, p. 53.

*J. Terry Wiggins* argued the cause for petitioner. With him on the brief was *Frederick A. Fielder, Jr.*

*Solicitor General McCree* argued the cause for the United States. With him on the brief were *Assistant Attorney General Heymann, Deputy Solicitor General Frey, Elinor Hadley Stillman,* and *Joel M. Gershowitz.**

Mr. Chief Justice Burger delivered the opinion of the Court.

We granted certiorari to consider whether an accused may invoke the privilege against adverse spousal testimony so as

---

*Briefs of *amici curiae* were filed by *Frank E. Booker* for the Michigan Bar Association Standing Committee on Civil Procedure; and by *Mr. Booker* for the Missouri Bar.

to exclude the voluntary testimony of his wife.  440 U. S. 934
(1979).  This calls for a re-examination of *Hawkins* v. *United
States*, 358 U. S. 74 (1958).

I

On March 10, 1976, petitioner Otis Trammel was indicted
with two others, Edwin Lee Roberts and Joseph Freeman, for
importing heroin into the United States from Thailand and
the Philippine Islands and for conspiracy to import heroin
in violation of 21 U. S. C. §§ 952 (a), 962 (a), and 963.  The
indictment also named six unindicted co-conspirators, includ-
ing petitioner's wife Elizabeth Ann Trammel.

According to the indictment, petitioner and his wife flew
from the Philippines to California in August 1975, carry-
ing with them a quantity of heroin.  Freeman and Roberts
assisted them in its distribution.  Elizabeth Trammel then
traveled to Thailand where she purchased another supply of
the drug.  On November 3, 1975, with four ounces of heroin
on her person, she boarded a plane for the United States.
During a routine customs search in Hawaii, she was searched,
the heroin was discovered, and she was arrested.  After dis-
cussions with Drug Enforcement Administration agents, she
agreed to cooperate with the Government.

Prior to trial on this indictment, petitioner moved to sever
his case from that of Roberts and Freeman.  He advised the
court that the Government intended to call his wife as an
adverse witness and asserted his claim to a privilege to pre-
vent her from testifying against him.  At a hearing on the
motion, Mrs. Trammel was called as a Government witness
under a grant of use immunity.  She testified that she and
petitioner were married in May 1975 and that they remained
married.[1]  She explained that her cooperation with the Gov-
ernment was based on assurances that she would be given

---

[1] In response to the question whether divorce was contemplated, Mrs.
Trammel testified that her husband had said that "I would go my way
and he would go his."  App. 27.

lenient treatment.[2]  She then described, in considerable detail, her role and that of her husband in the heroin distribution conspiracy.

After hearing this testimony, the District Court ruled that Mrs. Trammel could testify in support of the Government's case to any act she observed during the marriage and to any communication "made in the presence of a third person"; however, confidential communications between petitioner and his wife were held to be privileged and inadmissible.  The motion to sever was denied.

At trial, Elizabeth Trammel testified within the limits of the court's pretrial ruling; her testimony, as the Government concedes, constituted virtually its entire case against petitioner. He was found guilty on both the substantive and conspiracy charges and sentenced to an indeterminate term of years pursuant to the Federal Youth Corrections Act, 18 U. S. C. § 5010 (b).[3]

In the Court of Appeals petitioner's only claim of error was that the admission of the adverse testimony of his wife, over his objection, contravened this Court's teaching in *Hawkins* v. *United States, supra,* and therefore constituted reversible error.  The Court of Appeals rejected this contention.  It concluded that *Hawkins* did not prohibit "the voluntary testimony of a spouse who appears as an unindicted co-conspirator under grant of immunity from the Government in return for her testimony."  583 F. 2d 1166, 1168 (CA10 1978).

## II

The privilege claimed by petitioner has ancient roots.  Writing in 1628, Lord Coke observed that "it hath beene resolved

---

[2] The Government represents to the Court that Elizabeth Trammel has not been prosecuted for her role in the conspiracy.

[3] Roberts and Freeman were also convicted.  Roberts was sentenced to two years' imprisonment.  Freeman received an indeterminate sentence under the Youth Corrections Act.

by the Justices that a wife cannot be produced either against or for her husband." 1 E. Coke, A Commentarie upon Littleton 6b (1628). See, generally, 8 J. Wigmore, Evidence § 2227 (McNaughton rev. 1961). This spousal disqualification sprang from two canons of medieval jurisprudence: first, the rule that an accused was not permitted to testify in his own behalf because of his interest in the proceeding; second, the concept that husband and wife were one, and that since the woman had no recognized separate legal existence, the husband was that one. From those two now long-abandoned doctrines, it followed that what was inadmissible from the lips of the defendant-husband was also inadmissible from his wife.

Despite its medieval origins, this rule of spousal disqualification remained intact in most common-law jurisdictions well into the 19th century. See *id.*, § 2333. It was applied by this Court in *Stein* v. *Bowman,* 13 Pet. 209, 220–223 (1839), in *Graves* v. *United States,* 150 U. S. 118 (1893), and again in *Jin Fuey Moy* v. *United States,* 254 U. S. 189, 195 (1920), where it was deemed so well established a proposition as to "hardly requir[e] mention." Indeed, it was not until 1933, in *Funk* v. *United States,* 290 U. S. 371, that this Court abolished the testimonial disqualification in the federal courts, so as to permit the spouse of a defendant to testify in the defendant's behalf. *Funk,* however, left undisturbed the rule that either spouse could prevent the other from giving adverse testimony. *Id.,* at 373. The rule thus evolved into one of privilege rather than one of absolute disqualification. See J. Maguire, Evidence, Common Sense and Common Law 78–92 (1947).

The modern justification for this privilege against adverse spousal testimony is its perceived role in fostering the harmony and sanctity of the marriage relationship. Notwithstanding this benign purpose, the rule was sharply criticized.[4]

---

[4] See Brosman, Edward Livingston and Spousal Testimony in Louisiana, 11 Tulane L. Rev. 243 (1937); Hutchins & Slesinger, Some Observations

Professor Wigmore termed it "the merest anachronism in legal theory and an indefensible obstruction to truth in practice." 8 Wigmore § 2228, at 221. The Committee on Improvements in the Law of Evidence of the American Bar Association called for its abolition. 63 American Bar Association Reports 594–595 (1938). In its place, Wigmore and others suggested a privilege protecting only private marital communications, modeled on the privilege between priest and penitent, attorney and client, and physician and patient. See 8 Wigmore § 2332 et seq.[5]

These criticisms influenced the American Law Institute, which, in its 1942 Model Code of Evidence, advocated a privilege for marital confidences, but expressly rejected a rule vesting in the defendant the right to exclude all adverse testimony of his spouse. See American Law Institute, Model Code of Evidence, Rule 215 (1942). In 1953 the Uniform Rules of Evidence, drafted by the National Conference of Commissioners on Uniform State Laws, followed a similar course; it limited the privilege to confidential communications and "abolishe[d] the rule, still existing in some states, and largely a sentimental relic, of not requiring one spouse to testify against the other in a criminal action." See Rule 23 (2) and comments. Several state legislatures enacted similarly patterned provisions into law.[6]

---

on the Law of Evidence: Family Relations, 13 Minn. L. Rev. 675 (1929); Note, 24 Calif. L. Rev. 472 (1936); Note, 35 Mich. L. Rev. 329 (1936); Note, 10 So. Cal. L. Rev. 94 (1936); Note, 20 Minn. L. Rev. 693 (1936).

[5] This Court recognized just such a confidential marital communications privilege in *Wolfle* v. *United States,* 291 U. S. 7 (1934), and in *Blau* v. *United States,* 340 U. S. 332 (1951). In neither case, however, did the Court adopt the Wigmore view that the communications privilege be substituted *in place of* the privilege against adverse spousal testimony. The privilege as to confidential marital communications is not at issue in the instant case; accordingly, our holding today does not disturb *Wolfle* and *Blau.*

[6] See Note, Competency of One Spouse to Testify Against the Other in

In *Hawkins* v. *United States,* 358 U. S. 74 (1958), this Court considered the continued vitality of the privilege against adverse spousal testimony in the federal courts. There the District Court had permitted petitioner's wife, over his objection, to testify against him. With one questioning concurring opinion, the Court held the wife's testimony inadmissible; it took note of the critical comments that the common-law rule had engendered, *id.,* at 76, and n. 4, but chose not to abandon it. Also rejected was the Government's suggestion that the Court modify the privilege by vesting it in the witness-spouse, with freedom to testify or not independent of the defendant's control. The Court viewed this proposed modification as antithetical to the widespread belief, evidenced in the rules then in effect in a majority of the States and in England, "that the law should not force or encourage testimony which might alienate husband and wife, or further inflame existing domestic differences." *Id.,* at 79.

*Hawkins,* then, left the federal privilege for adverse spousal testimony where it found it, continuing "a rule which bars the testimony of one spouse against the other unless both consent." *Id.,* at 78. Accord, *Wyatt* v. *United States,* 362 U. S. 525, 528 (1960).[7] However, in so doing, the Court made clear that its decision was not meant to "foreclose whatever changes in the rule may eventually be dictated by 'reason and experience.'" 358 U. S., at 79.

---

Criminal Cases Where the Testimony Does Not Relate to Confidential Communications: Modern Trend, 38 Va. L. Rev. 359 (1952).

[7] The decision in *Wyatt* recognized an exception to *Hawkins* for cases in which one spouse commits a crime against the other. 362 U. S., at 526. This exception, placed on the ground of necessity, was a long-standing one at common law. See *Lord Audley's Case,* 123 Eng. Rep. 1140 (1631); 8 Wigmore § 2239. It has been expanded since then to include crimes against the spouse's property, see *Herman* v. *United States,* 220 F. 2d 219, 226 (CA4 1955), and in recent years crimes against children of either spouse, *United States* v. *Allery,* 526 F. 2d 1362 (CA8 1975). Similar exceptions have been found to the confidential marital communications privilege. See 8 Wigmore § 2338.

## III

### A

The Federal Rules of Evidence acknowledge the authority of the federal courts to continue the evolutionary development of testimonial privileges in federal criminal trials "governed by the principles of the common law as they may be interpreted . . . in the light of reason and experience." Fed. Rule Evid. 501. Cf. *Wolfle* v. *United States,* 291 U. S. 7, 12 (1934). The general mandate of Rule 501 was substituted by the Congress for a set of privilege rules drafted by the Judicial Conference Advisory Committee on Rules of Evidence and approved by the Judicial Conference of the United States and by this Court. That proposal defined nine specific privileges, including a husband-wife privilege which would have codified the *Hawkins* rule and eliminated the privilege for confidential marital communications. See proposed Fed. Rule Evid. 505. In rejecting the proposed Rules and enacting Rule 501, Congress manifested an affirmative intention not to freeze the law of privilege. Its purpose rather was to "provide the courts with the flexibility to develop rules of privilege on a case-by-case basis," 120 Cong. Rec. 40891 (1974) (statement of Rep. Hungate), and to leave the door open to change. See also S. Rep. No. 93–1277, p. 11 (1974); H. R. Rep. No. 93–650, p. 8 (1973).[8]

Although Rule 501 confirms the authority of the federal courts to reconsider the continued validity of the *Hawkins*

---

[8] Petitioner's reliance on 28 U. S. C. § 2076 for the proposition that this Court is without power to reconsider *Hawkins* is ill-founded. That provision limits this Court's *statutory* rulemaking authority by providing that rules "creating, abolishing, or modifying a privilege shall have no force or effect unless . . . approved by act of Congress." It was enacted principally to insure that state rules of privilege would apply in diversity jurisdiction cases unless Congress authorized otherwise. In Rule 501 Congress makes clear that § 2076 was not intended to prevent the federal courts from developing testimonial privilege law in federal criminal cases on a case-by-case basis "in light of reason and experience"; indeed Congress encouraged such development.

rule, the long history of the privilege suggests that it ought not to be casually cast aside. That the privilege is one affecting marriage, home, and family relationships— already subject to much erosion in our day—also counsels caution. At the same time, we cannot escape the reality that the law on occasion adheres to doctrinal concepts long after the reasons which gave them birth have disappeared and after experience suggests the need for change. This was recognized in *Funk* where the Court "decline[d] to enforce . . . ancient rule[s] of the common law under conditions as they now exist." 290 U. S., at 382. For, as Mr. Justice Black admonished in another setting, "[w]hen precedent and precedent alone is all the argument that can be made to support a court-fashioned rule, it is time for the rule's creator to destroy it." *Francis* v. *Southern Pacific Co.,* 333 U. S. 445, 471 (1948) (dissenting opinion).

**B**

Since 1958, when *Hawkins* was decided, support for the privilege against adverse spousal testimony has been eroded further. Thirty-one jurisdictions, including Alaska and Hawaii, then allowed an accused a privilege to prevent adverse spousal testimony. 358 U. S., at 81, n. 3 (STEWART, J., concurring). The number has now declined to 24.[9] In 1974, the National

---

[9] Eight States provide that one spouse is incompetent to testify against the other in a criminal proceeding: see Haw. Rev. Stat. § 621–18 (1976); Iowa Code § 622.7 (1979); Miss. Code Ann. § 13–1–5 (Supp. 1979); N. C. Gen. Stat. § 8–57 (Supp. 1977); Ohio Rev. Code Ann. § 2945.42 (Supp. 1979); Pa. Stat. Ann., Tit. 42, §§ 5913, 5915 (Purdon Supp. 1979); Tex. Crim. Proc. Code Ann., Art. 38.11 (Vernon 1979); Wyo. Stat. § 1–12–104 (1977).

Sixteen States provide a privilege against adverse spousal testimony and vest the privilege in both spouses or in the defendant-spouse alone: see Alaska Crim. Proc. Rule 26 (b)(2); Colo. Rev. Stat. § 13–90–107 (1973); Idaho Code § 9–203 (Supp. 1979); Mich. Comp. Laws § 600.2162 (1968); Minn. Stat. § 595.02 (1978); Mo. Rev. Stat. § 546.260 (1978); Mont. Code Ann. § 46–16–212 (1979); Neb. Rev. Stat. § 27–505 (1975); Nev. Rev. Stat. § 49.295 (1977); N. J. Stat. Ann. §·2A:84A–17 (West 1976); N. M. Stat. Ann. § 20–4–505 (Supp. 1977); Ore. Rev. Stat. § 44.040

Conference on Uniform State Laws revised its Uniform Rules of Evidence, but again rejected the *Hawkins* rule in favor of a limited privilege for confidential communications. See Uniform Rules of Evidence, Rule 504. That proposed rule has been enacted in Arkansas, North Dakota, and Oklahoma—each of which in 1958 permitted an accused to exclude adverse spousal testimony.[10] The trend in state law toward

(1977); Utah Code Ann. § 78–24–8 (1977); Va. Code § 19.2–271.2 (Supp. 1979); Wash. Rev. Code § 5.60.060 (Supp. 1979); W. Va. Code § 57–3–3 (1966).

Nine States entitle the witness-spouse alone to assert a privilege against adverse spousal testimony: see Ala. Code § 12–21–227 (1975); Cal. Evid. Code Ann. §§ 970–973 (West 1966 and Supp. 1979); Conn. Gen. Stat. § 54–84 (1979); Ga. Code § 38–1604 (1978); Ky. Rev. Stat. § 421.210 (Supp. 1978); La. Rev. Stat. Ann. § 15:461 (West 1967); Md. Cts. & Jud. Proc. Code Ann. §§ 9–101, 9–106 (1974); Mass. Gen. Laws Ann., ch. 233, § 20 (West Supp. 1979); R. I. Gen. Laws § 12–17–10 (1970).

The remaining 17 States have abolished the privilege in criminal cases: see Ariz. Rev. Stat. Ann. § 12–2231 (Supp. 1978); Ark. Stat. Ann. § 28–101, Rules 501 and 504 (1979); Del. Code Ann., Tit. 11, § 3502 (1975); Fla. Stat. §§ 90.501, 90.504 (1979); Ill. Rev. Stat., ch. 38, § 155–1 (1977); Ind. Code §§ 34–1–14–4, 34–1–14–5 (1976); Kan. Stat. Ann. §§ 60–407, 60–428 (1976); Maine Rules of Evidence 501, 504; N. H. Rev. Stat. Ann. § 516.27 (1974); N. Y. Crim. Proc. Law § 60.10 (McKinney 1971); N. Y. Civ. Proc. Law §§ 4502, 4512 (McKinney 1963); N. D. Rules of Evidence 501, 504; Okla. Stat., Tit. 12, §§ 2103, 2501, 2504 (West Supp. 1979); S. C. Code § 19–11–30 (1976); S. D. Comp. Laws Ann. §§ 19–13–1, 19–13–12 to 19–13–15 (1979); Tenn. Code Ann. § 40–2404 (1975); Vt. Stat. Ann., Tit. 12, § 1605 (1973); Wis. Stat. §§ 905.01, 905.05 (1975).

In 1901, Congress enacted a rule of evidence for the District of Columbia that made husband and wife "competent but not compellable to testify for or against each other," except as to confidential communications. This provision, which vests the privilege against adverse spousal testimony in the witness-spouse, remains in effect. See 31 Stat. 1358, §§ 1068, 1069, recodified as D. C. Code § 14–306 (1973).

[10] In 1965, California took the privilege from the defendant-spouse and vested it in the witness-spouse, accepting a study commission recommendation that the "latter [was] more likely than the former to determine whether or not to claim the privilege on the basis of the probable effect on the marital relationship." See Cal. Evid. Code Ann. §§ 970–973 (West

divesting the accused of the privilege to bar adverse spousal testimony has special relevance because the laws of marriage and domestic relations are concerns traditionally reserved to the states. See *Sosna* v. *Iowa,* 419 U. S. 393, 404 (1975). Scholarly criticism of the *Hawkins* rule has also continued unabated.[11]

## C

Testimonial exclusionary rules and privileges contravene the fundamental principle that " 'the public . . . has a right to every man's evidence.' " *United States* v. *Bryan,* 339 U. S. 323, 331 (1950). As such, they must be strictly construed and accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Elkins* v. *United States,* 364 U. S. 206, 234 (1960) (Frankfurter, J., dissenting). Accord, *United States* v. *Nixon,* 418 U. S. 683,

---

1966 and Supp. 1979) and 1 California Law Revision Commission, Recommendation and Study relating to The Marital "For and Against" Testimonial Privilege, at F–5 (1956). See also 6 California Law Revision Commission, Tentative Privileges Recommendation—Rule 27.5, pp. 243–244 (1964).

Support for the common-law rule has also diminished in England. In 1972, a study group there proposed giving the privilege to the witness-spouse, on the ground that "if [the wife] is willing to give evidence . . . the law would be showing excessive concern for the preservation of marital harmony if it were to say that she must not do so." Criminal Law Revision Committee, Eleventh Report, Evidence (General) 93.

[11] See Reutlinger, Policy, Privacy, and Prerogatives: A Critical Examination of the Proposed Federal Rules of Evidence as They Affect Marital Privilege, 61 Calif. L. Rev. 1353, 1384–1385 (1973); Orfield, The Husband-Wife Privileges in Federal Criminal Procedure, 24 Ohio St. L. J. 144 (1963); Rothstein, A Re-evaluation of the Privilege Against Adverse Spousal Testimony in the Light of its Purpose, 12 Int'l and Comp. L. Q. 1189 (1963); Note, 1977 Ariz. St. L. J. 411; Comment, 17 St. Louis L. J. 107 (1972); Comment, 15 Wayne L. Rev. 1287, 1334–1337 (1969); Comment, 52 J. Crim. L. 74 (1961); Note, 56 Nw. U. L. Rev. 208 (1961); Note, 32 Temp. L. Q. 351 (1959); Note, 33 Tulane L. Rev. 884 (1959).

709–710 (1974). Here we must decide whether the privilege against adverse spousal testimony promotes sufficiently important interests to outweigh the need for probative evidence in the administration of criminal justice.

It is essential to remember that the *Hawkins* privilege is not needed to protect information privately disclosed between husband and wife in the confidence of the marital relationship— once described by this Court as "the best solace of human existence." *Stein* v. *Bowman,* 13 Pet., at 223. Those confidences are privileged under the independent rule protecting confidential marital communications. *Blau* v. *United States,* 340 U. S. 332 (1951); see n. 5, *supra.* The *Hawkins* privilege is invoked, not to exclude private marital communications, but rather to exclude evidence of criminal acts and of communications made in the presence of third persons.

No other testimonial privilege sweeps so broadly. The privileges between priest and penitent, attorney and client, and physician and patient limit protection to private communications. These privileges are rooted in the imperative need for confidence and trust. The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return. The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out. Similarly, the physician must know all that a patient can articulate in order to identify and to treat disease; barriers to full disclosure would impair diagnosis and treatment.

The *Hawkins* rule stands in marked contrast to these three privileges. Its protection is not limited to confidential communications; rather it permits an accused to exclude all adverse spousal testimony. As Jeremy Bentham observed more than a century and a half ago, such a privilege goes far beyond making "every man's house his castle," and permits a person

to convert his house into "a den of thieves." 5 Rationale of Judicial Evidence 340 (1827). It "secures, to every man, one safe and unquestionable and ever ready accomplice for every imaginable crime." *Id.*, at 338.

The ancient foundations for so sweeping a privilege have long since disappeared. Nowhere in the common-law world—indeed in any modern society—is a woman regarded as chattel or demeaned by denial of a separate legal identity and the dignity associated with recognition as a whole human being. Chip by chip, over the years those archaic notions have been cast aside so that "[n]o longer is the female destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas." *Stanton* v. *Stanton*, 421 U. S. 7, 14–15 (1975).

The contemporary justification for affording an accused such a privilege is also unpersuasive. When one spouse is willing to testify against the other in a criminal proceeding—whatever the motivation—their relationship is almost certainly in disrepair; there is probably little in the way of marital harmony for the privilege to preserve. In these circumstances, a rule of evidence that permits an accused to prevent adverse spousal testimony seems far more likely to frustrate justice than to foster family peace.[12] Indeed, there is reason to believe that vesting the privilege in the accused could actually undermine the marital relationship. For example, in a case such as this, the Government is unlikely to offer a wife immunity and lenient treatment if it knows that her husband can prevent her from giving adverse testimony. If the Government is dissuaded from making such an offer, the privilege can have the untoward effect of permitting one

---

[12] It is argued that abolishing the privilege will permit the Government to come between husband and wife, pitting one against the other. That, too, misses the mark. Neither *Hawkins*, nor any other privilege, prevents the Government from enlisting one spouse to give information concerning the other or to aid in the other's apprehension. It is only the spouse's testimony in the courtroom that is prohibited.

spouse to escape justice at the expense of the other. It hardly seems conducive to the preservation of the marital relation to place a wife in jeopardy solely by virtue of her husband's control over her testimony.

## IV

Our consideration of the foundations for the privilege and its history satisfy us that "reason and experience" no longer justify so sweeping a rule as that found acceptable by the Court in *Hawkins*. Accordingly, we conclude that the existing rule should be modified so that the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying. This modification—vesting the privilege in the witness-spouse—furthers the important public interest in marital harmony without unduly burdening legitimate law enforcement needs.

Here, petitioner's spouse chose to testify against him. That she did so after a grant of immunity and assurances of lenient treatment does not render her testimony involuntary. Cf. *Bordenkircher* v. *Hayes*, 434 U. S. 357 (1978). Accordingly, the District Court and the Court of Appeals were correct in rejecting petitioner's claim of privilege, and the judgment of the Court of Appeals is

*Affirmed.*

Mr. Justice Stewart, concurring in the judgment.

Although agreeing with much of what the Court has to say, I cannot join an opinion that implies that "reason and experience" have worked a vast change since the *Hawkins* case was decided in 1958. In that case the Court upheld the privilege of a defendant in a criminal case to prevent adverse spousal testimony, in an all-but-unanimous opinion by Mr. Justice Black. Today the Court, in another all-but-unanimous opinion, obliterates that privilege because of the pur-

ported change in perception that "reason and experience" have wrought.

The fact of the matter is that the Court in this case simply accepts the very same arguments that the Court rejected when the Government first made them in the *Hawkins* case in 1958. I thought those arguments were valid then,[1] and I think so now.

The Court is correct when it says that "[t]he ancient foundations for so sweeping a privilege have long since disappeared." *Ante,* at 52. But those foundations had disappeared well before 1958; their disappearance certainly did not occur in the few years that have elapsed between the *Hawkins* decision and this one. To paraphrase what Mr. Justice Jackson once said in another context, there is reason to believe that today's opinion of the Court will be of greater interest to students of human psychology than to students of law.[2]

---

[1] "The rule of evidence we are here asked to re-examine has been called a 'sentimental relic.' It was born of two concepts long since rejected: that a criminal defendant was incompetent to testify in his own case, and that in law husband and wife were one. What thus began as a disqualification of either spouse from testifying at all yielded gradually to the policy of admitting all relevant evidence, until it has now become simply a privilege of the criminal defendant to prevent his spouse from testifying against him.

"Any rule that impedes the discovery of truth in a court of law impedes as well the doing of justice. When such a rule is the product of a conceptualism long ago discarded, is universally criticized by scholars, and has been qualified or abandoned in many jurisdictions, it should receive the most careful scrutiny. Surely 'reason and experience' require that we do more than indulge in mere assumptions, perhaps naive assumptions, as to the importance of this ancient rule to the interests of domestic tranquillity." *Hawkins* v. *United States,* 358 U. S. 74, 81–82 (concurring opinion) (citations and footnotes omitted).

[2] See *Zorach* v. *Clauson,* 343 U. S. 306, 325 (dissenting opinion).