**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Christopher GRAY, Defendant–
Appellant.**

**No. 00–6309.**

United States Court of Appeals,
Sixth Circuit.

July 29, 2003.

Before: RYAN and BATCHELDER, Circuit Judges; and TARNOW, District Judge.*

RYAN, Circuit Judge.

A jury convicted the defendant, Christopher Gray, of aiding and abetting the interstate transportation of falsely made or forged securities, in violation of 18 U.S.C. § 2314, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). The district court sentenced

* The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

Gray to a term of 52 months' imprisonment, which included a sentence enhancement for obstruction of justice pursuant to section 3C1.1 of the United States Sentencing Guidelines. Gray appeals his conviction and sentence, claiming that the district court erred by admitting portions of his ex-wife's testimony and by increasing his sentence for obstruction of justice. For the reasons discussed below, we affirm Gray's conviction and sentence.

## I.

On February 23, 2000, a grand jury indicted Christopher Gray; his mother, Brenda Gray; and his wife at the time, Shannon Gray (now known as Shannon Bolden) on charges related to a false check-cashing scheme. The events leading to the indictment began in March 1998, when Brenda Gray worked at the accounting firm Chitwood and Chitwood. Pursuant to her responsibilities at Chitwood, Brenda Gray had authority to write checks drawn upon the accounts of the firm's clients. Near the end of March 1998, Shannon Gray told her mother-in-law, Brenda Gray, that she and Christopher needed financial help.

Brenda Gray began writing unauthorized checks from a client's account, made out to "AMG," which represented the initials of her daughter. Brenda Gray deposited these checks into her daughter's account, then withdrew the money she deposited and gave it to Christopher and Shannon Gray. The unauthorized checks written to "AMG" totaled approximately $42,500. Brenda Gray next wrote unauthorized checks to "CSG," which represented a combination of the initials of Christopher and Shannon Gray. Brenda Gray gave some of these checks, written for amounts ranging from $5,000 to $9,000, directly to Christopher or Shannon Gray. Christopher Gray frequently visited his mother's office to pick up the checks, which he then cashed or deposited.

Eventually the bank at which Christopher and Shannon Gray had been cashing the checks informed them that it would no longer cash checks bearing only initials. Thereafter, Christopher and Brenda Gray concluded it would be best to issue the checks to "S. Bearden." They used the last name "Bearden" because it was Shannon Gray's maiden name. Christopher Gray endorsed and cashed "S. Bearden" checks totaling more than $75,000. The checks to "CSG" and "S. Bearden" totaled approximately $113,000.

Brenda Gray pleaded guilty to charges related to the fraudulent checks. Prior to Christopher Gray's trial, he and Shannon Gray divorced. She remarried and became known as Shannon Bolden. She pleaded guilty to charges related to the scheme and testified for the government at Christopher Gray's trial. At his trial, Christopher Gray testified that he never knew the money he received from his mother had been stolen from Chitwood's clients. Brenda Gray testified that she did not want her son to discover that she had obtained the money illegally, so she told her son the checks were "loans" from Chitwood. Bolden provided crucial testimony for the government. She testified about specific conversations she had with Christopher, while she was still married to him, in which he admitted that he knew his mother was stealing the money. The jury convicted Christopher Gray of aiding and abetting the transportation of forged securities "knowing the same to have been stolen," 18 U.S.C. § 2314, and conspiracy to commit money laundering "knowing that the property involved ... represents ... some form of unlawful activity," 18 U.S.C. § 1956(a)(1) & (h).

Based on his convictions, Christopher Gray had an offense level of 21. Pursuant

to section 3C1.1 of the sentencing guidelines, the district court included a two-level increase for obstruction of justice based on its conclusion that Christopher Gray committed perjury at his trial. Using an offense level of 23, the district court sentenced Christopher Gray to 52 months' imprisonment, three years of supervised release, and $113,000 in restitution. Christopher Gray now appeals his conviction and sentence.

## II.

The primary issue in this appeal is whether the district court erred when it allowed the defendant's former wife, Shannon Bolden, to testify about conversations she had with the defendant while they were married. We review this claim for plain error because the defendant did not object to the testimony at trial. *See United States v. Fortson,* 194 F.3d 730, 736 (6th Cir.1999). To establish plain error, the defendant must show that (1) an error occurred in the district court, (2) the error was plain, *i.e.,* obvious or clear, (3) the error affected his substantial rights, and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Koeberlein,* 161 F.3d 946, 949 (6th Cir. 1998).

The defendant argues that the district court should have excluded portions of his ex-wife's testimony because, according to him, she testified about confidential marital communications, and as such, her testimony was privileged. The government contends that the testimony was properly admitted under the "joint participants" exception to the privilege for confidential marital communications. The government also argues that even if the district court erred when it admitted the testimony, it did not commit plain error.

In a federal criminal trial, testimonial privileges "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501. The Supreme Court has held, pursuant to the common law, that "marital communications are presumptively confidential." *Blau v. United States,* 340 U.S. 332, 333, 71 S.Ct. 301, 95 L.Ed. 306 (1951). Such confidential communications between spouses are privileged and thus may be excluded as evidence. *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). The defendant spouse may assert the marital communications privilege to exclude the testimony of the witness spouse concerning confidential marital communications. *United States v. Sims,* 755 F.2d 1239, 1241 (6th Cir.1985). To assert the privilege, the defendant spouse must satisfy three requirements: (1) at the time of the communication, there must have been a marriage recognized as valid by state law; (2) the application of the privilege must be limited to utterances or expressions intended by one spouse to convey a message to the other; and (3) the communication must be made in confidence. *United States v. Porter,* 986 F.2d 1014, 1018 (6th Cir.1993).

This court recognizes the "joint participants" exception to the privilege for confidential marital communications, meaning that "confidential marital communications are not protected if they pertain to joint criminal activity of the spouses." *Sims,* 755 F.2d at 1241. In adopting this exception, we held that it must be construed narrowly. *Id.* at 1243. Only those communications that "pertain to patently illegal activity" may be admitted under the exception. *Id.* Such a narrow construction is necessary "to protect the privacy of marriage and encourage open and frank marital communications." *Id.* However,

the public's interest in discovering the truth about criminal activity outweighs the interest in protecting marriage when "spouses engage in conversations regarding joint ongoing or future patently illegal activity." *Id.*

The defendant claims that four portions of Bolden's testimony should not have been admitted because they were privileged. First, the defendant challenges the following portion of Bolden's testimony concerning his knowledge of his mother's activities:

Q  [ (GOVERNMENT):] ... At some point did you begin to realize how she [ (Brenda Gray) ] was getting this money?

. . . .

Q[:]  Did you have any discussions with your husband about that?

A [ (Bolden):] Yes, sir.

Q[:]  What were those discussions?

A[:]  I asked him—You know, we talked; did we think that she was taking the money. At first we didn't think that she was because she told us—we confronted her with it, was she taking the money. She said no. And then it just got to the point where Chris and I knew that she had to be taking the money; there was no other way for her to get the money.

[DEFENSE COUNSEL]: Your Honor, I'm going to object to her testifying about what Chris may or may not have known. That calls for speculation on her part.

. . . .

[GOVERNMENT]: Your Honor, I believe she is talking about conversations that they had. I think a rational person could testify, under Rule 702, about what her and her husband's understanding was under these circumstances.

THE COURT: Ma'am, limit yourself at this time to things that you thought and things that your husband said. If you would like to tell the jury what your husband believed, then tell us why it is you came to that conclusion.

[BOLDEN]: Okay. Because he told me that he knew.

■  Bolden's testimony about this conversation meets the three requirements of the privilege: (1) Bolden and the defendant were married at the time; (2) the communication about his mother's actions was intended to convey a message; and (3) the communication was made in confidence. *See Porter,* 986 F.2d at 1018. However, the exception for joint participants defeats the privilege. *See Sims,* 755 F.2d at 1241. The defendant's argument that the exception only applies to statements that are "unlawful on their face" reflects a fundamental misunderstanding of the law.

We have explained quite clearly that the exception applies to any conversation *"pertain[ing]* to joint criminal activity" or *"regarding* joint ongoing or future patently illegal activity." *Sims,* 755 F.2d at 1241–43 (emphasis added). The challenged statements need not reveal an explicit, step-by-step account of the crime to be admissible. Here, Bolden and the defendant discussed an essential element of the criminal activity with which they were charged–that the securities they received were in fact unlawfully obtained. More specifically, the conversation presented evidence "pertain[ing] to" or "regarding" the defendant's awareness of the fraud surrounding the checks he cashed or deposited. The defendant's statements, therefore, were properly admitted under the joint participants exception to the privilege for confidential marital communications.

Another portion of the challenged testimony was likewise admissible under precisely the same reasoning:

Q [ (GOVERNMENT):] Now, did you ever have any discussions with Mr. Gray about the legality of this, whether what you-all were doing was right or wrong, illegal, or whether you could get caught? Did you have any such discussions?

A [ (Bolden):] Yes, sir.

Q[:] Tell us about those, please.

A[:] I asked him if there was any way that we could get in trouble. I had never been in trouble, and I didn't want to get in trouble. He told me we had nothing to worry about; his mom was the one taking the money, and if she was caught, then we could deny everything, and it would be her butt that would go, not ours.

Q[:] Now, were those his words?

A[:] Yes, sir.

Again, the exception applies because in this conversation, Bolden and the defendant acknowledged their joint participation in the scheme. They not only discussed the possibility that they could get "in trouble," but they also considered that they could "deny everything" if necessary. Their discussion concerning the illegality of the actions taken by the scheme's central figure, Brenda Gray, "pertain[s] to" and "regard[s]" joint illegal activity because it indicates that the defendant knew his mother's actions were illegal, meaning that his own role in the scheme–perpetuating the fraud by cashing or depositing the checks–was also illegal.

A third portion of Bolden's testimony, also challenged as privileged, was properly admitted for a different reason. In this instance, the presence of a third party destroyed the privilege. Bolden testified that the following conversation took place after the bank refused to accept checks bearing only initials:

A [ (Bolden):] Because my husband at the time, Chris, came home and said, you know, the bank had refused to accept any more checks with initials. And we, in turn, got on the phone with his mom.

Q [ (GOVERNMENT):] Okay. Who was on the phone with his mom Brenda?

A[:] He was.

Q[:] What was said? Did you hear the conversation?

A[:] I only heard his end of the conversation.

Q[:] Okay. What did you hear him say?

A[:] He told her that the bank refused to take the checks, and that there had to be a name, a printed name, on the check in order for them to keep accepting them.

Q[:] Okay.

A[:] And they said, you know, to put my name, use S. Bearden, you know. He told me that his mom said that that wouldn't red-flag anything, my maiden name being on the checks; if anything was caught or suspicious, that my maiden name wouldn't bring, I guess, light to it; they wouldn't think anything about that.

■ This conversation was properly admitted because a third party, Brenda Gray, was present. The presence of a third party nullifies the otherwise privileged character of a conversation between spouses. *United States v. Klayer,* 707 F.2d 892, 894 (6th Cir.1983). Although Brenda Gray was not physically present, she was present "on the phone," in a manner similar to the third party in *Klayer* whose presence on the phone defeated the privilege. *Id.* Furthermore, the essential communication here was the telephone conversation between the defendant and his mother, not the defendant and his wife. Thus, the prerequisites for asserting the privilege are not satisfied; the communica-

tion was neither intended by one spouse to convey a message to the other, nor made in confidence. *See Porter,* 986 F.2d at 1018.

The fourth challenged portion of Bolden's testimony is the only portion we find arguably inadmissible. Bolden testified as follows:

> [The defendant] said that he found a truck he wanted and he had tried to get it on his own credit and his credit was too bad; they wouldn't do it; they said he had to have a sizeable down payment. So he called his mother and told his mom that he needed money for a down payment on a car, and she told him she would see what she could do.

■ Bolden's recount of the defendant's interest in purchasing a truck neither pertains to joint criminal activity nor regards joint ongoing or future patently illegal activity. Additionally, there is no indication that a third party was present when the defendant discussed the truck with Bolden. Thus, it seems to us that neither exception to the privilege applies to this testimony. However, even if this testimony should have been excluded, its admission was not plain error because other evidence, including the defendant's own testimony, demonstrated that he asked for and received money from Brenda Gray to buy a truck.

Although we have concluded that the remainder of the challenged testimony was properly admitted, we note that even if the district court erred by admitting some privileged testimony, it did not commit plain error. The government presented ample evidence from which the jury could have concluded that the defendant knew the money was stolen, beginning with the fact that he deposited and cashed checks made out to meaningless initials, up to and including the fact that both he and his wife were suspicious about the source of the funds. In fact, the district court concluded at sentencing that "[n]o reasonable person

in [the defendant's] shoes, being exposed to the situation he was exposed to, could not have known that the money was stolen." In light of all the evidence, none of Bolden's challenged testimony could have seriously affected the defendant's "substantial rights" or the "fairness, integrity, or public reputation" of the proceedings. *Koeberlein,* 161 F.3d at 949.

### III.

Next, we turn to the issue of whether the defendant was denied the effective assistance of counsel when his trial counsel did not object to the portions of Bolden's testimony challenged in this appeal. Generally, ineffective assistance of counsel claims are not cognizable on direct appeal, and instead are more properly presented in post-conviction proceedings pursuant to 28 U.S.C. § 2255. *United States v. Rahal,* 191 F.3d 642, 645 (6th Cir.1999). We may consider the claim on direct appeal only in the unusual case in which the parties have adequately developed the record, making an evidentiary hearing unnecessary. *United States v. Pierce,* 62 F.3d 818, 833 (6th Cir.1995). We do not have such a case before us, and accordingly, we will not address the defendant's Sixth Amendment claim.

### IV.

In addition to challenging his conviction, the defendant challenges his sentence. The district court sentenced the defendant based on an offense level of 23, which included a two-level increase for obstruction of justice. The district court applied the enhancement pursuant to section 3C1.1 of the United States Sentencing Guidelines because it concluded that the defendant had committed perjury when he testified at his trial. The defendant now argues that the district court erred in applying the enhancement because it did not make independent findings of fact to support each instance of perjury.

We use a three-step process to review a district court's decision to impose a sentence enhancement for obstruction of justice pursuant to section 3C1.1. *United States v. Chance*, 306 F.3d 356, 389 (6th Cir.2002). First, we review for clear error the district court's findings of fact underlying the enhancement. *Id.* Second, we review *de novo* the district court's conclusion that the facts constitute obstruction of justice. *Id.* Third, we review *de novo* the application of the enhancement. *Id.*

Section 3C1.1 of the guidelines authorizes a two-level enhancement if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1(A) (2000). The Application Notes to section 3C1.1 include "committing, suborning, or attempting to suborn perjury" as conduct that constitutes obstruction of justice. U.S.S.G. § 3C1.1, comment. (n.4(b)).

However, the Notes also state that the enhancement was "not intended to punish a defendant for the exercise of a constitutional right." U.S.S.G. § 3C1.1, comment. (n.2). Accordingly, the Supreme Court has described the conditions under which a district court may impose the section 3C1.1 enhancement. *See United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). The Court explained that in order to determine what constitutes perjury, the district court must consider whether the sworn witness gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.* The Court then insisted that when a defendant objects to the enhancement, "a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction

of justice, or an attempt to do the same" according to the definition of perjury. *Id.* at 95.

We have directed district courts to meet two specific requirements before imposing a section 3C1.1 enhancement. *United States v. Lawrence*, 308 F.3d 623, 632 (6th Cir.2002). First, the district court must "identify those particular portions of [the] defendant's testimony that it considers to be perjurious." *Id.* Second, the district court must "either make a specific finding for each element of perjury or, at least, make a finding that encompasses all of the factual predicates for a finding of perjury." *Id.* Although we have never insisted on "rigid adherence" to these guidelines, *United States v. Sassanelli*, 118 F.3d 495, 501 (6th Cir.1997), we have made it clear that the district court may not merely recognize conflicting testimony and resolve in its own mind which witness is credible, nor may it broadly consider everything the defendant said at trial to be perjurious. *Lawrence*, 308 F.3d at 633.

■ In our view, the district court complied with the requirements established in *Dunnigan* and clarified in *Lawrence*. In sentencing the defendant, the district court stated:

> [T]he Court believes that ... where Mr. Gray testified that he did not know that his mother had stolen the money does constitute perjury, that Mr. Gray lied under oath when he said that, with the intent to influence the actions of the jury.

The district court identified the statement that it considered perjurious–the defendant's claim that he did not know the money was stolen–and found that it met the elements of perjury. In making this finding, the district court relied on the testimony of Shannon Bolden, Brenda Gray, and the fact that no "reasonable person" in the defendant's situation "could not have known that the money was sto-

len." As such, the district court's statement satisfied our directive. Simply because more than one piece of evidence, or even the evidence as a whole, showed the defendant committed perjury does not mean that the district court failed to make sufficient findings, especially in a case such as this one, which involved primarily circumstantial rather than direct evidence. We may vacate the sentence only "if there was no indication at the sentencing hearing as to what statements were contended to be materially untruthful." *Sassanelli*, 118 F.3d at 501. This is not such a case; the district court sufficiently indicated at sentencing which statements warranted the section 3C1.1 enhancement.

## V.

For the foregoing reasons, we **AFFIRM** Christopher Gray's conviction and sentence.