**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 15-3627
_____

ELAINE SWANGER; VICTOR SWANGER,
as Parents and Legal Guardians of BJS;
B. J. S.,

Appellants

v.

WARRIOR RUN SCHOOL DISTRICT; PATRICIA CROSS;
DOUGLAS BARENZETTI; TAMMY OSENGA;
CYNTHIA DEL GOTTO; DUANE MATTISON;
DIVERSIFIED TREATMENT ALTERNATIVES, INC.;
ALVIN WEAVER

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D. C. No. 4-11-cv-00894)
District Judge:  Honorable Robert D. Mariani

Argued on July 13, 2016

BEFORE:  SMITH, ROTH and RENDELL, Circuit Judges

(Opinion filed: August 31, 2016)

Amy R. Boring, Esquire
Joshua J. Cochran, Esquire **(Argued)**
Michael J. Zicolello, Esquire
Schemery Zicolello
333 Market Street
Williamsport, PA   17701

                Counsel for Appellants


Rolf E. Knoll, Esquire **(Argued)**
Barry A. Kronthal, Esquire
Margolis Edelstein
3510 Trindle Road
Camp Hill, PA   17108

Michael R. Miller, Esquire
Margolis Edelstein
170 South Independence Mall West
The Curtis Center, Suite 400E
Philadelphia, PA   17106

                Counsel for Appellees Warrior Run School District, Patricia
                Cross, Douglas Bertanzetti, Tammy Osenga, Cynthia Del
                Gotto


Donald H. Blackwell, II, Esquire **(Argued)**
William A. Hebe, Esquire
Spencer, Gleason, Hebe & Rague
17 Central Avenue
Wellsboro, PA  16901

                Counsel for Appellee Duane Mattison

Thomas E. Brenner, Esquire **(Argued)**
Goldberg Katzman, PC
4250 Crums Mill Road
P. O. Box 6691
Suite 301
Harrisburg, PA   17112

Counsel for Appellees Diversified Treatment Alternatives, Inc., Alvin Weaver

———————

O P I N I O N[*]

———————

**RENDELL**, Circuit Judge:

In March 2011, Duane Mattison molested B.J.S., a mentally challenged young girl, as the two sat in a special education class at Warrior Run High School. Mattison had a long, troubled history of sexual misconduct, both as a victim and as an aggressor, and had been undergoing treatment with Diversified Treatment Alternatives (DTA), a nonprofit organization that provides psychiatric treatment to troubled male youths. Following the assault, B.J.S.'s parents, Elaine and Victor Swanger, sued Warrior Run School District, DTA, and several individuals associated with these organizations, alleging they knew that Mattison was a sexual predator and therefore knowingly placed B.J.S. in danger, and asserting various claims under both state and federal law. The District Court granted summary judgment against the Swangers on all counts, but we will not address the substantive merits of these rulings, as the District Court erred when it

———————

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

denied the Swangers' earlier motion to review in camera approximately 1,500 pages of documents from Mattison's DTA treatment file to determine which ones were privileged. We will thus vacate the District Court's order denying this motion, as well as its subsequent summary judgment orders, and remand for further proceedings consistent with this opinion.

I.

In 2007, after repeated incidents of sexual misconduct, Mattison began treatment with DTA. During this process, he admitted to a long history of sexual assault. In February 2009, he graduated from the DTA program and enrolled at Warrior Run High School as a sophomore in the school's special education program. While attending Warrior Run, Mattison was still supervised and treated by DTA. Alvin Weaver, a counselor at DTA, was the primary individual in charge of Mattison's treatment.

In the fall of 2009, during his junior year at Warrior Run, DTA pulled Mattison from school "because of concerns about his potential to act out sexually." App. 1225. Mattison had apparently engaged in "sexual contact with a chicken" at his foster home, *id.*, compelling DTA to feel that "it would be safer for everyone if [Mattison] was at the Alternative Education program for the rest of 11th grade," App. 1222. Mattison returned to Warrior Run in the fall of 2010 after a period during which he did not act out sexually.

In March 2011, Mattison assaulted B.J.S. as they sat in Cynthia Del Gotto's English class. Another student in the class reported to Del Gotto that he had seen Mattison molest B.J.S. and had heard Mattison ask her for oral sex. Douglas Bertanzetti, the assistant principal who was the first school administrator contacted, informed the

4

Swangers and Alvin Weaver at DTA of what had occurred. Soon thereafter, the Swangers reported the incident to the police, and Mattison ultimately pled guilty to indecent assault and nolo contendere to indecent exposure.

In May 2011, the Swangers, as parents and guardians of B.J.S., sued Warrior Run School District, DTA, and the following individuals: principal Patricia Cross; assistant principal Douglas Bertanzetti; teachers Cynthia Del Gotto and Tammy Osenga; and Alvin Weaver of DTA. They claimed that these defendants, in violation of state and federal law, knew that Mattison was a sexual predator but still placed him in a position in which he could harm B.J.S. Against Warrior Run School District, they claimed violations of § 504 of the Rehabilitation Act and Title IX of the Education Amendments of 1972. Against Cross, Bertanzetti, Del Gotto, and Osenga, they claimed a violation of B.J.S.'s substantive due process rights via 42 U.S.C. § 1983. Against DTA and Weaver, they also claimed a violation of B.J.S.'s substantive due process rights, as well as negligence. In September 2015, the District Court granted summary judgment against the Swangers on all counts, mainly concluding that they had not shown that the defendants knew or should have known that Mattison posed a danger to B.J.S.

The District Court had previously denied the Swangers' motion asking it to review and order the production of numerous documents from Mattison's DTA treatment file. In 2013, DTA had produced a privilege log to the Swangers that listed as privileged approximately 1,500 pages of documents from Mattison's DTA file. These documents included psychological and psychiatric evaluations, individual treatment plans, discharge summaries, quarterly case reports, and various notes concerning Mattison's treatment.

*See* App. 319–21. Seeking these documents, the Swangers asserted to the District Court that they "are relevant to establish what was known about Defendant Mattison's history of unwanted sexual behaviors, by whom, and to whom information was provided." App. 312. According to the Swangers, these documents "provide a crucial link in the evidence against DTA and the Warrior Run Defendants." Swangers' Br. 17.

In 2014, the District Court denied the Swangers' motion for an in camera review of the documents. In doing so, it surmised that at least some of the documents were privileged under the federal psychotherapist-patient privilege. But it then concluded that, to the extent that any of these documents were not protected from disclosure under this privilege, they were nevertheless *all* "protected from disclosure by a different privilege, specifically, the Mental Health Procedures Act," a Pennsylvania state law that provides, broadly, that "'[a]ll documents concerning persons in treatment shall be kept confidential and, without the person's written consent, may not be released or their contents disclosed to anyone.'" App. 839 (quoting 50 Pa. Cons. Stat. § 7111(a)). We focus our review on the Swangers' argument that the District Court erred by applying the MHPA, a Pennsylvania state privilege law, to this case that involves both federal and state claims.

II.

But before we address that argument, we will consider the Swangers' contention that the District Court erred in rejecting their argument that Mattison waived any confidentiality privileges potentially applicable to these documents. If Mattison did in fact waive these privileges, then we need not even consider the Swangers' argument that the District Court erred in its MHPA ruling.

6

Mattison did not explicitly waive any privileges, but the Swangers argue that he did so implicitly—by testifying at his deposition about his past treatment for sexual misconduct, by failing to assert any privileges during his deposition or criminal hearing, and by disclosing ninety-four pages of the DTA documents during discovery.

We disagree. Once a district court determines that there was insufficient evidence to show waiver of a privilege, "we review its judgment for abuse of discretion." *In re Impounded*, 241 F.3d 308, 318 (3d Cir. 2001). Here, the District Court considered each of the Swangers' waiver arguments and reasonably rejected them. For example, it reviewed Mattison's deposition and determined that his testimony regarding his treatment at DTA was "minimal and superficial at best." App. 843. It also determined, for instance, that Mattison was not presented with a situation at his deposition that would have required him to invoke any privileges. We thus find no abuse of discretion in the District Court's determination that Mattison did not waive any privileges.

### III.

We will next address the Swangers' argument that the District Court erred by concluding that the MHPA, a state law, protected from disclosure all of the DTA documents at issue. With this ruling, the District Court, in effect, concluded that the MHPA's broad confidentiality protections should be adopted as a federal common law privilege in this case. Our review is therefore *de novo*. *See In re Sealed Case*, 148 F.3d

1073, 1075 (D.C. Cir. 1998) ("Because the recognition of a testimonial privilege is a legal issue, our review is *de novo*.").[1]

Under Federal Rule of Evidence 501, which governs all evidentiary privileges asserted in federal court, "federal privileges apply to federal law claims, and state privileges apply to claims arising under state law." *Pearson v. Miller*, 211 F.3d 57, 66 (3d Cir. 2000). However, in cases involving both federal and state claims, "especially where, as here, the evidence in dispute is apparently relevant to both the state and the federal claims," "Rule 501 directs us to apply federal privilege law." *Id.*

Federal privilege law has developed over the years as a matter of federal common law. *See* Fed. R. Evid. 501 ("The common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege unless any of the following provides otherwise: the United States Constitution; a federal statute; or rules prescribed by the Supreme Court."). Indeed, Rule 501 "reflect[s] the view that the recognition of a privilege based on a confidential relationship . . . should be determined on a case-by-case basis," and thus "direct[s] federal courts to continue the evolutionary development of testimonial privileges." *Jaffee v. Redmond*, 518 U.S. 1, 8–9 (1996) (internal quotation marks omitted). In *Jaffee*, for example, the Supreme Court recognized

---

[1] The Swangers failed to raise their argument regarding the MHPA to the District Court. But we will nevertheless consider this legal issue on appeal because the District Court's adoption of the MHPA kept all of the documents from view, which may have wrongfully deprived the Swangers of the opportunity to prove their case with a full record and, as we note below, runs counter to the federal policy of open disclosure. *See Loretangeli v. Critelli*, 853 F.2d 186, 189 n.5 (3d Cir. 1988) ("This court may consider a pure question of law even if not raised below where refusal to reach the issue would result in a miscarriage of justice or where the issue's resolution is of public importance.").

the psychotherapist-patient privilege as a part of federal common law, holding that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis are protected from compelled disclosure under Rule 501." *Id.* at 15.

Federal courts are reluctant to establish new evidentiary privileges. "For more than three centuries it has now been recognized as a fundamental maxim that the public . . . has a right to every man's evidence," and so "[w]hen we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional." *Id.* (internal quotation marks omitted). Thus, "[t]he general test to be applied in assessing privilege candidates is whether such a privilege 'promotes sufficiently important interests to outweigh the need for probative evidence.'" *Pearson*, 211 F.3d at 67 (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)).

"The case for recognizing a particular federal privilege is stronger, however, where the information sought is protected by a state privilege." *Id.* The Supreme Court has consistently "observed that the policy decisions of the States bear on the question whether federal courts should recognize a new privilege." *Jaffee*, 518 U.S. at 12–13 (citing *Trammel*, 445 U.S. at 48–50; *United States v. Gillock*, 445 U.S. 360, 368 n.8 (1980)). Accordingly, "a federal court 'may see fit for special reasons to give the law of a particular state highly persuasive or even controlling effect, but in the last analysis its decision turns upon the law of the United States, not that of any state." *Pearson*, 211 F.3d at 67 (quoting *Riley v. City of Chester*, 612 F.2d 708, 715 (3d Cir. 1979)).

We have thus formulated a test for whether to recognize "federal law privileges that amount to parallels of . . . state law privileges." *Id.* at 69. A federal court must determine, "granting due respect to Pennsylvania's protections, whether a privilege of the kind sought . . . promotes sufficiently important interests to outweigh the need for probative evidence, where the need for probative evidence is viewed as a very weighty consideration indeed—to the extent that only the strongest considerations on the other side of the scale are capable of outweighing it." *Id.* (internal citation and quotation marks omitted).

The District Court never engaged in this assessment; it simply concluded that the MHPA's confidentiality protections applied. While the MHPA and the federal psychotherapist-patient privilege overlap to the extent that they both protect "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis," *Jaffee*, 518 U.S. at 1, the MHPA "creates a much broader protection, forbidding the disclosure of *any document* 'concerning persons in treatment' *regardless of the contents of that document*," *Hahnemann Univ. Hosp. v. Edgar*, 74 F.3d 456, 465 (3d Cir. 1996). The question, then, is whether federal courts should recognize the MHPA's broader protections as a federal privilege—that is, whether these broader protections "promote[] sufficiently important interests" so as "to outweigh the need for probative evidence, where the need for probative evidence is viewed as a very weighty consideration indeed." *Pearson*, 211 F.3d at 69 (internal quotation marks and citation omitted). Because the District Court never reasoned through this question, we will vacate its ruling and remand for it to apply the *Pearson* test to the MHPA issue.

10

IV.

For these reasons, we will vacate the District Court's December 31, 2014, order denying the Swangers' motion for an in camera review of the documents in Mattison's DTA file, as well as its subsequent summary judgment orders, and remand for it to apply the *Pearson* test to the MHPA issue. If it declines to recognize the MHPA as a federal common law privilege, it should review the DTA documents in camera to determine the extent to which they are protected under the narrower *federal* psychotherapist-patient privilege.